ROBERT JOHNSON, JR., PLAINTIFF-RESPONDENT, v. SALEM CORPORATION, SALEM FURNACE COMPANY, INC., HERR-VOSS CORPORATION, AND SALEM BROUSIS, COMPANY, INC., DEFENDANTS-APPELLANTS.

Argued January 9, 1984—Decided July 18, 1984.

*Robert F. Colquhoun* argued the cause for appellants (*Colquhoun & Colquhoun,* attorneys).

*Sheldon Bross* argued the cause for respondent (*Horowitz, Bross, Sinins & Imperial,* attorneys; *Elliot M. Bross,* on the brief).

The opinion of the Court was delivered by

HANDLER, J.

This is a strict products liability case arising out of the injury to an operator of an industrial machine. The appeal presents several evidential and procedural issues. One issue involves the propriety of a judgment notwithstanding the verdict ("*n.o.v.*") entered by the trial court in favor of the plaintiff following a jury verdict of no cause for action. This issue requires our examination of the standards for evaluating evidence, particularly expert testimony, under the strict liability doctrine and determining when such evidence can fairly be characterized as sufficiently free from dispute to present only a

question of law. Another issue arises from the procedure followed in this case of permitting the jury to return a verdict of damages for plaintiff notwithstanding the jury's determination that defendants were not liable. This issue calls for consideration of whether the separation or bifurcation of jury deliberations on liability and damages respectively is appropriate and, if so, under what circumstances.

Following the trial court's judgment *n.o.v.* in favor of plaintiff in the amount of the jury's damages award, an appeal was taken by defendants. The Appellate Division affirmed the trial court's judgment on liability in favor of plaintiff but reversed the award of damages and remanded the matter for a trial on damages alone. 189 *N.J.Super.* 50 (App.Div.1983). We granted defendants' petition for certification, 94 *N.J.* 527 (1983). For the reasons given in this opinion, we affirm the judgment of the Appellate Division.

I

Plaintiff, Robert Johnson, Jr., suffered a crushing injury to his right hand while he was operating a scrap baling machine that had been manufactured in 1955 by defendants. The purpose of the scrap baling machine was to press long ribbons of metal scraps into a compact form for sale or reprocessing. The machine consisted of two horizontal rollers, which were positioned one above the other. The meeting point of the two rollers is called an in-running nip point. The operator threaded the metal ribbons through a ground level opening onto the bottom roller, called the mandril or arbor. When the machine was activated, the mandril rotated inward. Because it was positioned against the other roller, which weighed 1,000 pounds, the mandril's rotation caused the upper roller to rotate inward also.[1] This rotation would continuously draw in the strips or

---

[1] An expert witness compared the mechanism to the double horizontal rollers used to wring clothes on old-fashioned washing machines.

ribbons of metal, which would then be pounded and compressed into compact form.

At the time of the accident, the machine was operated by forward and reverse buttons.[2] There was also a horizontal emergency stop bar, approximately one-and-one-half feet long, located in front of the machine immediately above the feeding area. At the start of the operation, the operator's hands would be in the nip area in order to attach the metal ribbons to the mandril. If the ribbons broke during the baling process, a frequent occurrence, the operator would again have to place his or her hands at the nip area to reattach the ribbons or tie the broken ribbons together.

The only way to stop the machine, so that the operator could safely put his or her hands in the nip area to attach or reattach the ribbons, was for the operator to depress the stop bar. The machine was supposed to remain stopped until the operator reactivated it by pushing the forward or reverse button. However, plaintiff offered uncontradicted testimony that the emergency stop bar had not been working properly for one-and-one-half years before the accident and that the machine would sometimes restart without the operator pressing the forward or reverse buttons. He also claimed that his employer had not corrected this problem despite his regular complaints to his foreman.

On the day of the accident, plaintiff was operating the machine when the metal ribbons broke off the mandril. He stopped the machine by depressing the stop bar with his left

---

[2]There was conflicting testimony whether the machine also had a stop button at the time of the accident. Defendants' expert attempted to testify that, based on literature, there was a stop button. An objection was sustained because the witness did not identify the literature upon which he was relying. The court later allowed the same witness to testify that one of the machine's two safety devices was a stop button, but the court acknowledged that no data had been introduced to support the source of the witness's knowledge. No further testimony regarding the stop button was offered and, ultimately, the court ruled that "[t]here was no stop button on the machine."

arm. As he began to rethread the machine with his right hand, his left arm accidently slipped off the stop bar and the machine started up, catching his cotton work glove in the rotating mandril. His hand was pulled into the nip point and crushed between the rollers. Falling forward, plaintiff's head struck the stop bar and stopped the machine; a fellow worker pushed the reverse button so that his hand was discharged from the machine.

Both parties presented the testimony of experts to explain the hazards in the design and operation of the machine. As already mentioned, the trial court ultimately set aside the jury verdict of liability in favor of defendants based on its assessment of the testimony of the experts. It is, consequently, essential that this testimony be reviewed in detail.

Howarth, a mechanical engineer, testified as plaintiff's expert. He stated that

[w]hen this machine was designed and manufactured, it was not designed with prudent engineering and is not reasonably safe * * *. It placed the operator in a point of vulnerability which should not have occurred.

Howarth based his conclusion on several considerations. The manufacturer would have known that in the normal use of the machine, the operator's hands would have to be at the nip point at certain times. Also, scrap baling machines, like other power machinery, are subject to accidental start-up, which could occur from someone unintentionally starting the machine. Additionally, mechanical malfunction and interruptions or surges in the flow of electric power could also cause accidental start-up. Further, Howarth testified that there was no guard against accidental start-up on the scrap baling machine, although the concept of guarding in-running nip points was widely recognized in the 1950's and there were several different types of guards available at the time of manufacture.

Howarth also described and diagrammed a type of guard that inexpensively and feasibly could have been installed on the scrap baling machine to protect operators from injuries at the nip point. Since the machine as originally designed had an

emergency stop bar, Howarth incorporated it into his proposed safety device. The proposed guard would consist of a forty-inch-long horizontal trough or chute extending outward from the feeder opening to the area where the operator would normally stand. The chute would be too long to permit an operator to reach through it to the nip point to attach or reattach the ribbons to the mandril. However, there would be a hinged lid on the top of the chute that could be opened to give operators easy access to the nip point only when such access would be safe—that is, only when the machine's emergency stop bar was depressed. In addition, to protect against accidental reactivation of the machine while the lid was open, the machine would be equipped with an electrical interlock device to make operation of the machine impossible unless the lid was closed; both the trough and the lid would have electrical contact points that would have to be touching to complete the electrical circuit and activate the machine.

According to Howarth, such safety devices would have prevented a worker from getting his or her hand or arm accidentally drawn between the rollers while attaching or reattaching ribbons at the dangerous nip point. Under Howarth's proposed design, even if the operator's arm were caught in the ribbons and dragged into the chute, he or she would at most suffer cuts or scratches from the metal ribbons but would not suffer a more serious crushing injury from the rollers at the nip point. Moreover, if the operator's arm were dragged into the chute, he or she could pull down the emergency stop bar to prevent the machine from drawing in the ribbons any further and thereby prevent more severe lacerations. According to the expert, even if the emergency stop was not working, it would still release the chute lid, which would in turn stop the power. Howarth also stated that the cost of these safety devices would be minimal and would not decrease the machine's capacity.

Lutz, also a mechanical engineer, was defendants' expert witness. Lutz testified, based on his inspection of the scrap baling machine, that "[i]n relationship to the function for which

the machine was designed or what it was designed to accomplish, it is a safe machine." He based his conclusion on his belief that the machine had two safety devices in the immediate proximity of loading—a stop button and the stop bar. However, he testified further, on cross-examination, that the concept of guarding in-running nip points was known since at least 1913, that it was foreseeable to manufacturers of power machinery that accidental start-up can occur, and that accidental start-ups probably were foreseeable to defendants in 1955, when the machine was manufactured. Additionally, he acknowledged that the operator would place his or her hands in a dangerous area while threading or rethreading the machine. Finally, Lutz acknowledged that there was no guard on the machine and conceded that he had no knowledge of anything that defendants had done to eliminate the risk from an accidental start-up. With respect to the alternative safety device proposed by plaintiff's expert, Lutz expressed the opinion that it would be both impracticable and hazardous.

At the close of the evidence, plaintiff moved for a judgment on liability. The court expressed as a finding that defendants' expert had "completely misconstrue[d] the design that the plaintiff's expert suggested as a means of making this machine safer." It ruled that there was no risk-utility that would bar use of the safety device described by plaintiff's expert because it "would not be either too expensive or render this machine inoperable for the purpose for which it was designed." Nevertheless, the court reserved its decision on the motion in accordance with Rule 4:40–2 and submitted the case to the jury to determine liability and damages. Upon the jury's later inquiry, the court further instructed it to determine damages regardless of its determination of liability. The jury concluded that defendants were not liable because the machine was reasonably safe as manufactured. Nonetheless, it assessed damages in accordance with the court's instruction, which it fixed at $275,-000. The court then ruled on plaintiff's continuing motion for judgment on liability and granted a judgment *n.o.v.*, awarding

the plaintiff $275,000 in damages. The court thereafter denied defendants' motion for a new trial.

After reviewing the expert testimony offered by both parties, the Appellate Division adopted the reasoning of the trial court, finding that "reasonable minds could not, on this record, have differed in concluding that the scrap baling machine" was not safe under strict liability standards. 189 *N.J.Super.* at 58. However, it disagreed with the trial court's judgment as to damages. Accordingly, the court affirmed the judgment *n.o.v.* but ordered a new trial on the issue of damages. *Id.* at 61.

## II

The elements of strict products liability involving design defects are firmly established. The plaintiff's *prima facie* case requires proof that (1) the product design was defective; (2) the defect existed when the product left the hands of defendant; and (3) the defect caused injury to a reasonably foreseeable user. *O'Brien v. Muskin Corp.*, 94 *N.J.* 169, 179 (1983). The primary determinant of whether the product is defective in terms of its design ordinarily involves application of the risk-utility analysis to determine whether the utility of the product outweighs its risk of harm. *Id.* at 181. The analysis calls for a consideration and balancing of relevant factors bearing on both the utility and the safety of the product. *Id.* Relevant evidence would relate to the primary purpose of the product, the likelihood of injury due to design, and the effect of improvements in safety design on the utility or the price of the product. *Id.* at 182 (citing *Cepeda v. Cumberland Eng'g. Co., Inc.*, 76 *N.J.* 152, 174 (1978)).

State-of-the-art is a relevant factor in considering the adequacy of the design of the product under the risk-utility analysis, including particularly design features relating to safety. *See O'Brien, supra,* 94 *N.J.*, at 182. State-of-the-art has been defined as "the existing level of technological expertise and scientific knowledge relevant to a particular industry at the

time a product is designed." *Id.* While "[t]he ultimate burden of proving a defect is on the plaintiff, * * * the burden is on the defendant to prove that compliance with state-of-the-art, in conjunction with other relevant evidence, justifies placing a product on the market." *Id.* at 183. Further, state-of-the-art evidence relates to both sides of the risk-utility axis: the risks that the manufacturer should have known the product posed and, on the other side of the balance, the need for the product and available design alternatives. *Id.* at 183–84.

■ We have also recognized that disputed factual matters are to be resolved by the jury. Ordinarily the jury should be permitted to determine whether "the risks of injury so out-weighed the utility of the product as to constitute a defect." *Id.* at 184. We have noted, however, that

[i]f the minds of reasonable men could not differ on whether the risks posed by a product outweigh its utility, or vice versa, then the court could make the appropriate determination as a matter of law * * *. If, however, there is a fact question whether the risks outweigh the utility of the product, then the matter is for the trier of fact. [*Id.* at 186.]

In this case, the critical question is whether defendants met their burden of showing that the utility of the product out-weighs its risks in light of all the relevant evidence, including compliance with the state-of-the-art. As noted, defendants' expert expressed the conclusion that the scrap baling machine was reasonably safe for its intended purpose because it had two safety devices: the stop button and the emergency stop bar. The trial court found that there was no stop button on the machine at the time of the accident, as is further demonstrated by photographs of the machine submitted into evidence. Thus, one of the two essential elements upon which defendants' expert relied for his conclusion that the machine was reason-ably safe was lacking.

■ The inadequacy of the stop bar was the basis of plain-tiff's theory of why the machine was not reasonably safe. Plaintiff's evidence was that nip guarding was known when the machine was manufactured, that the operator would be in a

vulnerable position in the normal use of the machine from accidental start-ups, which were foreseeable, and, further, that defendant did nothing to guard against accidental start-ups. Lutz conceded on cross-examination that the stop bar would not guard against accidental start-ups. Therefore, by virtue of the admission of defendants' own expert of the foreseeability of accidental start-up and defendants' failure to guard against it, there was no factual basis to support the expert's conclusion that the machine was reasonably safe.

Further, defendants' expert concentrated his testimony on the feasibility of Howarth's proposed alternative. Lutz's primary criticism was based on the notion that threading of the machine must be done through a "tunnel" that did not have a movable lid. Consequently, he believed that the use of such a tunnel would be impracticable and hazardous.[3] Howarth's proposal, however, envisaged a trough with a hinged lid at the top that opened to permit the operator to load the machine without being near the nip point. As the Appellate Division noted, defendants' expert clearly did not understand the safety device proposed by Howarth. 189 *N.J.Super.* at 56.

We concur with the courts below that defendants' evidence concerning the presence of a design defect did not rebut that of plaintiff and did not fairly pose a factual dispute required to be resolved by the jury. Evidence Rule 56(2) directs that experts may base their opinions on facts or data made known to them before or at the hearing, and that the underlying facts or data need not be admissible, "[i]f of a type reasonably relied upon by

---

[3]Another objection Lutz posed to the proposed guard was not inconsistent with Howarth's description. The stop bar would be three-and-one-half feet from the end of the trough. If the operator's hand or glove were caught in the metal ribbons, the distance would affect the "instantaneousness of this machine bar rotation." The trial court found, however—and correctly as we review the record—that Lutz had never testified that the operator would not be able to reach the stop bar. Moreover, Howarth had testified that the stop bar was not his preferred design but was only a simple means of improving the safety of defendants' existing design.

experts in the particular field in forming opinions or inferences upon the subject * * *." Evidence Rule 56(2). Furthermore, Evidence Rule 57 allows a witness to give an opinion and reasons therefor, without the prior disclosure of the underlying facts or data on direct examination, although these can be inquired into on cross-examination. There are, however, limits to the permissible inferences that may be extracted from experts' testimony. "The weight to which an expert opinion is entitled can rise no higher than the facts and reasoning upon which that opinion is predicated." *N.J. Rules of Evidence* (Annot.1984), comment 7 to Evidence Rule 56, at 360; *see Scanlon v. General Motors Corp.*, 65 *N.J.* 582, 596 (1974) (expert testimony need not be submitted to jury when uncontradicted photographs destroyed factual predicate of plaintiff's theory).

Here, the testimony of defendants' expert was infirm in both its factual foundation and inherent reasoning. His expressed belief that the scrap baling machine was reasonably safe was not adequately supported by sufficient underlying facts. It amounted to no more than an inadmissible "net opinion," constituting the "expert's bare conclusions, unsupported by factual evidence." *Buckelew v. Grossbard*, 87 *N.J.* 512, 524 (1981). Further, Howarth's testimony that an alternative safety device could feasibly guard against the hazard of an accidental start-up was not rebutted by Lutz because his testimony was premised on a fundamental misunderstanding of Howarth's proposal.

As noted, plaintiff moved for a judgment on liability, pursuant to Rule 4:40–1, which "may be made by a party either at the close of all the evidence or at the close of the evidence offered by an opponent." Here, the trial court initially reserved its decision on this motion. The court submitted the case to the jury and continued to reserve decision on the pending motion pursuant to Rule 4:40–2(a). This Rule allows the court to reserve decision on a "motion for judgment made at the close of all the evidence, submit the case to the jury and then decide the

motion either before or within 10 days after the verdict * * *."
The court may enter judgment in accordance with the motion,
or in the interest of justice order a new trial, in lieu of granting
judgment *n.o.v.* In the instant case, the court ruled on plain-
tiff's motion for judgment by granting a judgment *n.o.v.* in
favor of plaintiff.

▮▮ We must therefore determine in the face of this evi-
dence whether the trial court properly entered a judgment for
plaintiff. *Dolson v. Anastasia,* 55 *N.J.* 2 (1969), requires the
court to consider as true all evidence supporting the position of
the opposing party, and to afford it the benefit of all reasonable
inferences; if reasonable minds could differ, the motions must
be denied. *Id.* at 5. This standard applies in strict products
liability cases. *O'Brien, supra,* 94 *N.J.* at 186. As stated by
the Appellate Division in this case:

> [T]he standard for granting a judgment *n.o.v.* is relatively mechanical and does
> not involve the weighing of evidence. Thus, it may only be granted if,
> accepting as true all of the evidence supporting the position of the party
> resisting it and according that party the benefit of all legitimate inferences
> deducible therefrom, reasonable minds could not differ on the resolution of the
> issue. *See, e.g., Dolson v. Anastasia,* 55 *N.J.* 2, 5–6 (1969). *See also,*
> *Finnegan v. Havir Mfg. Corp.,* 60 *N.J.* 413, 421 (1972); *Sabloff v. Yamaha*
> *Motor Co., Ltd.,* 113 *N.J.Super.* 279, 281 (App.Div.1971), aff'd o.b. 59 *N.J.* 365
> (1971); *Bell v. Eastern Beef Co.,* 42 *N.J.* 126, 129 (1964). [189 *N.J.Super.* at
> 53.]

▮ The Appellate Division further observed that simply
because proofs are undisputed is insufficient in and of itself to
warrant the grant of a motion for judgment or a subsequent
judgment *n.o.v.* in situations in which credibility is at issue,
since the fact-finder is free to reject those uncontested proofs
on credibility grounds. *Id.* at 54. Credibility is a jury question
when people "of reason and fairness may entertain differing
views as to the truth of testimony, whether it be uncontradict-
ed, uncontroverted or even undisputed * * *." *Ferdinand v.*
*Agricultural Ins. Co. of Watertown, N.Y.,* 22 *N.J.* 482, 494
(1956); *see Huddell v. Levin,* 537 *F.*2d 726, 737 (3d Cir.1976)
(applied rule in *Ferdinand* in vacating judgment *n.o.v.* in favor

of plaintiff when court found that defendant's expert testified on highly scientific matter without supporting documents).

However, credibility is not a jury question when testimony is reliable and uncontradicted.

[W]here the uncontradicted testimony of a witness, interested or otherwise, is unaffected by any conflicting inferences to be drawn from it and is not improbable, extraordinary or surprising in its nature, or there is no other ground for hesitating to accept it as the truth, there is no reason for denying the verdict dictated by such evidence. [*Ferdinand, supra,* 22 *N.J.* at 498 (citations omitted).]

The trial court, here, correctly decided that Howarth's credibility must be accepted. Howarth's expert credentials were not challenged. His testimony regarding the functioning of the machine, industry practice, and available safety devices was clear, consistent, and not incredible or extraordinary in nature. In fact, Lutz conceded the essence of this testimony. Further, as already explained, Howarth's testimony about the design alternative of the proposed guard was virtually undisputed.[4]

Thus, a sufficient factual basis for the defense expert's assertion that the machine was safe was lacking. Further, the factual basis for his rebuttal of plaintiff's expert's safer design alternative did not exist. *See Birchfield v. International Harvester Co.,* 726 *F.*2d 1131, 1138 (6th Cir.1984), citing *Orfield v. International Harvester Co.,* 535 *F.*2d 959 (6th Cir.1976) (holding that opinion of expert witness that bulldozer without a canopy was defectively designed and unreasonably dangerous did not require court to submit issue to jury when expert's opinion was not supported by evidence). These factual deficits in defendants' countervailing proofs in juxtaposition with the

---

[4]Defense counsel attempted to discredit Howarth by challenging his knowledge about the direction of movement of two cylinders, which were unrelated to the machine's point of operation. Howarth stated that whether the top cylinder went up and the bottom cylinder went down or vice versa made no difference in the overall operation of the machine and could not have contributed to the cause of the accident. This discussion was clearly marginal in relation to Howarth's entire testimony and irrelevant to the issues before the court.

facts affirmatively established by plaintiff's expert pertaining to risk-utility factors—including the foreseeability of the risk of an unguarded scrap baling machine and the existence of preventive guards at the time of manufacture that could have been installed economically and feasibly—effectively dissipated any genuine outstanding differences as to the ultimate factual conclusions to be reached. As we stated in *Scanlon, supra,* 65 *N.J.* at 597,

.[u]nlike the garden variety of cases wherein the facts are disputed and the benefit of all favorable inferences reasonably to be drawn from the evidence will be given, for motion purposes, to the party opposing the motion, with the jury rendering a conclusion through its verdict in favor of the party whose evidence on those disputed facts it finds more persuasive, no such dispute is discernible here.

■■■ Accordingly, we concur in the rulings of the lower courts that plaintiff established as a matter of law under the totality of the evidence that the scrap baling machine was defective as designed and while under control of defendants.

### III

A final element of plaintiff's case involves causation. The parties disagreed about the proximate cause of plaintiff's injury. Defendants have attempted to argue that the machine was safe when it left the manufacturer and that the proximate cause of the accident was not the machine's lack of safeguards, but rather "a lack of maintenance which materially and substantially altered it and its function at the time of the plaintiff's accident."

■■■ As we have explained, the evidence is uncontroverted that the lack of a guard was a defect in the design of the machine that existed when the machine left the control of defendants. Howarth testified without contradiction that a guard could have prevented plaintiff's accident. The manufacturer cannot escape its duty to install guards by alleging that the employer should have installed them or provided other safety devices. *See, e.g., Michalko v. Cooke Color & Chem.*

*Corp.*, 91 *N.J.* 386, 397 (1982); *Finnegan v. Havir Mfg. Co.*, 60 *N.J.* 413, 423 (1972); *Bexiga v. Havir Mfg. Co.*, 60 *N.J.* 402, 410 (1972).

Furthermore, defendants cannot escape liability because, here, the absence of a guard was at the very least a contributing causal factor in the happening of the accident. *Michalko, supra*, 91 *N.J.* at 400. Similarly, any evidence of negligent maintenance by the employer cannot constitute a defense for the defendants in these circumstances. We said in *Freund v. Cellofilm Properties Inc.*, 87 *N.J.* 229 (1981), responding to a similar argument concerning the legal effect of the negligence of the owner of the product:

> It is, of course, a basic principle of negligence jurisprudence that "there may be two or more concurrent and directly cooperative and efficient proximate causes of an injury." *Menth v. Breeze Corporation, Inc.*, 4 *N.J.* 428, 442 (1950); accord *Andreoli v. Natural Gas Co.*, 57 *N.J.Super.* 356, 367 (App.Div. 1959). When that occurs, both tortfeasors are liable even though their individual negligence "was not the sole negligence, or the sole proximate cause, and although [each party's] negligence, without such other independent intervening cause, would not have produced the injury." *Robbins v. Thies*, 117 *N.J.L.* 389, 394 (E. & A.1937). [*Id.* 87 *N.J.* at 245.]

Therefore, accepting, as we must, Howarth's testimony about an available guard and interlock that would have prevented the accident, a jury could not infer, as a matter of law, that negligent maintenance was the exclusive proximate cause of the accident. Stated differently, under the evidence presented, reasonable minds could not differ that the original design defect in the machine—the absence of a proper and effective nip-point guard—was either the sole cause of the accident, or a concurrent or contributing cause of the accident.

We accordingly conclude that the trial court and the Appellate Division correctly ruled in this case that defendants were liable under the strict products liability doctrine as a matter of law.

## IV

After reserving its decision on plaintiff's motion for judgment on liability, the trial court instructed the jury to determine

first liability and then damages. After the jury returned a "no cause" verdict, it awarded plaintiff $275,000 in damages. The court then granted plaintiff a judgment *n.o.v.* and awarded $275,000 in damages in accordance with the jury's assessment. The Appellate Division, as already stated, affirmed the judgment *n.o.v.* as to liability but reversed the damages award and remanded the case for a new trial only on damages, adopting the result reached in an earlier case, *Bleeker v. Trickolo,* 89 *N.J.Super.* 502 (App.Div.1965). It concluded "that a damages verdict accompanying a no cause for action is not reliable." 189 *N.J.Super.* at 58.

*Bleeker* involved an automobile negligence action. At the close of the evidence, the court denied plaintiff's motion for judgment on liability. The court then submitted a written interrogatory to the jurors asking them, in the event that they entered a verdict of "no cause," to determine the amount of damages they would have awarded if there had been a verdict in favor of plaintiff. In the jury charge, the court stated that the answer to the interrogatory was "for his own 'information.' " *Id.* 89 *N.J.Super.* at 505–06. After the jury returned a verdict of no cause, the trial court granted plaintiff's motion for judgment for liability and entered the amount of damages assessed by the jury. *Id.*

The Appellate Division in *Bleeker* discussed the propriety of this interrogatory procedure under former Revised Rule 4:50–2, which was identical to the current rule, *R.* 4:39–2, except for minor language changes. Revised Rule 4:50–2 provided in relevant part:

> *General Verdict Accompanied by Answer to Interrogatories.* The court may submit to the jury, together with appropriate forms for a general verdict, written interrogatories upon one or more issues of fact the decision of which is necessary to a verdict. The court shall give such explanation or instruction as may be necessary to enable the jury both to make answers to the interrogatories and to render a general verdict, and the court shall direct the jury both to make written answers and to render a general verdict.

The court held that the "special question" regarding damages was not authorized by the Rule and, therefore, remanded the

case for a new trial on damages. *Bleeker, supra,* 89 *N.J.Super.* at 508–09. The purpose of Revised Rule 4:50–2, according to the Appellate Division, was to allow special questions to determine the factual basis upon which the general verdict is placed. The Rule "permits written interrogatories upon one or more *issues of fact,* the decision of which is *necessary* to [the jury's] verdict. * * * The entire cast of Revised Rule 4:50–2 is such as to preclude the idea that any question and answer other than one *necessary* to explain the general verdict may be submitted to the jury * * *." *Id.* at 507–08 (emphasis in original).

In this case, the Appellate Division proposed a new procedure for jury deliberation designed to obviate a second trial on damages. 189 *N.J.Super.* at 58–59. The Appellate Division directed that in the future when a trial court reserves decision on a motion for a judgment on liability, the trial court should bifurcate the jury's deliberations. The trial court should first instruct the jury on liability and have the jury return its verdict on that issue alone. If the jury returns a verdict in plaintiff's favor or if the Court enters a judgment *n.o.v.* on the jury's "no cause," the court could then submit the issue of damages to the jury with appropriate explanations and instructions. The consequent damages verdict would thus overcome the taint of being only an "advisory" determination, criticized in *Bleeker,* and a new trial would be avoided. *Id.* at 59.

 We decline to follow the suggestion of the Appellate Division in this case and adopt the rationale of the Appellate Division in *Bleeker* for the present time. The *Bleeker* analysis comports with the plain language of Rule 4:39–2 and the policy which that rule presently embodies. *Wenner v. McEldowney & Co.,* 102 *N.J.Super.* 13, 19 (App.Div.1968), certif. den., 52 *N.J.* 493 (1968) (The rule [Revised Rule 4:50–2] "require[s] the jury to specifically consider the essential issues of the case, to clarify the court's charge to the jury, and to clarify the meaning of the verdict and permit error to be localized"); *see also*

*Nylander v. Rogers*, 41 *N.J.* 236, 240 (1963); *Terminal Constr. Corp. v. Bergen County, etc., District Authority*, 18 *N.J.* 294, 319 (1955).

However, we recognize that respectable arguments can be made in favor of the bifurcation of jury deliberations. One of course is the resultant judicial economy. Further, juries routinely demonstrate their ability to successfully perform difficult intellectual exercises requiring shifts of perspective in the course of their deliberations. For example, juries frequently are instructed to disregard certain evidence they have heard, to disregard questions of counsel as evidence, or to disregard evidence pertaining to a defense or cause of action that subsequently has been eliminated. It is arguable that when a jury, as in the instant case, has been presented with all the evidence regarding damages, it can still arrive at a fair award of damages, even after it has returned a verdict of "no cause" against plaintiff, assuming the trial court has issued appropriate instructions following its judgment *n.o.v.* for plaintiff. In fact, the Committee on Civil Case Management and Procedure, chaired by Justice Schreiber, has stated that "[i]n the interest of efficiency, judges should be permitted to present special interrogatories regarding damages to juries (with appropriate instructions), even in the event they find no liability." The Committee has recommended that "a rule permitting special damage interrogatories receive further consideration." "Toward a Theory of Civil Case Management," Civil Judicial Conference Committee, "H" at 80 (June 15, 1984).

We consequently leave the *Bleeker* rule intact, recognizing that the bifurcation of jury deliberations is an appropriate subject for future procedural rule-making.

## V

Accordingly, for the reasons set forth in this opinion, the judgment of the Appellate Division is affirmed as modified.

*For modification and affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.

*Opposed*—None.