LARIO, J.T.C.
This is an appeal by Double R Enterprises, a partnership, from a judgment of the Burlington County Board of Taxation which affirmed Bordentown Township’s 1990 tax year assessment of Land, $245,000; Improvements, $1,955,000 for a total of $2,200,000. The subject is a 100-unit garden-type apartment complex known as the Hillcrest Apartments located at 617 Hilltop Drive and identified on the township’s tax map as Block 17, Lot 2.02.
*457 At issue is the true value of the real property. The main question presented is whether the actual sales price of the subject property, which was sold within a few days prior to the assessing date, constitutes the fair market value of the property-
In arriving at their respective final conclusions of value both experts rejected the cost approach to value. Plaintiff’s expert, relying on the income approach, arrived at a true value conclusion of $2,452,000, whereas defendant’s expert, who utilized the market and the income approaches, arrived at an overall value of $3,250,000. The Director, Division of Taxation’s chapter 123 (N.J.S.A. 54:l-35a) average ratio of assessed to true value of real property for the township for the tax year 1990 is 65.49%. The 15% common level range results in an upper limit of 75.31% and a lower limit of 55.67%.
The subject property was purchased by plaintiff for the contract price of $3,285,000. Although defendant’s expert utilized both the income and market approaches to value, this sale, which closed on September 26, 1989, was given dominant consideration in his final conclusion of value. Plaintiff’s expert considered the sale but rejected its sales price as representative of true market value by reason, allegedly, of the buyer’s miscalculation of the condo-conversion market, the buyer’s lack of awareness of the building’s extensive building code violations and the sale’s financing terms. In arriving at his final conclusion of value he utilized solely the income approach to value.
Robert Lyon, a principal partner, testified that to consummate the sale he and his partner received very favorable financing. The purchase was subject to a pre-existing first mortgage of $2,312,000, a second mortgage of $675,000 and the remainder of approximately $285,000 was the partnership’s sole cash equity [1]. He further testified that, unknown to either the *458 seller or the buyer at the time of the purchase, the property was replete with building code violations; several months prior to closing an inspection had been made by the State of New Jersey but the results of that inspection were not made known to either the seller or buyer until after closing had taken place; there existed approximately 1,000 violations and the actual cost incurred by plaintiff to cure these violations was approximately $200,000. Additionally, after its purchase, the apartments were plagued with severe maintenance problems and a high vacancy rate.
Lyon stated that he had been in the real estate business for approximately six years. Previously, he had sold industrial equipment for power plants; thereafter, he and another individual formed the present partnership to buy and sell apartment complexes. Their first acquisition was a 100-unit apartment building in Trenton which they still own; subsequently, they bought three other small properties in Trenton and one small property in Boonton, New Jersey. Shortly prior to their purchase of the subject property, they purchased for resale as individual units two properties in East Orange which recently had been converted to condominiums. These purchases and their subsequent resales turned out to be very successful.
About the time they closed the second East Orange purchase, they began negotiations for the subject property. These negotiations, which took place without a broker, extended over a period of approximately six months. During this time the partners became aware that the seller had only recently purchased the property and was now offering the property at $100,000 less than he paid for it. Plaintiffs were offered the property subject to the two existing mortgages of approximately $3,000,000, for which there would be no personal liability, [the sole collateral being the property] and all that was required from them to complete the sale was “to put up cash of only approximately $285,000.” He further stated that, in effect, they were acquiring “an option on the property and an opportunity to achieve a significant gain. It was a high potential and the risk was only $285,000.”
*459 By reason of the success they were experiencing with their condominium purchases in East Orange, their understanding of the condominium sales market, the fact that they would be paying $100,000 less than the seller had recently paid and the favorable financing, they “thought the offering was a very attractive opportunity.” Accordingly, they agreed to purchase the property for the purpose of converting it for resale as individual condominium units and, in the interim, planned to operate it as an apartment housé until they were able to legally complete the conversion. He stated that they previously did not have any experience in converting property from rental apartments to condominiums.
He further testified that in February 1989 sales of condominiums “took place like hotcakes,” stating: “we thought we knew something about condominiums, however, I think I was a babe in the woods as to condominium conversion.” Almost immediately upon closing of title for the subject they discovered that the condominium market had completely collapsed. Prior to this time they had very good experience selling some of the condominiums in East Orange, however, in December 1989 all sales activity there completely stopped.
Plaintiffs expert testified that, about the time of purchase of the subject property, “the condominium market had taken a severe dive” and as of the assessment date there was “no capacity for the property to be converted to a condominium—it was not feasible.” He further stated, “I think that the price that was paid was well above what the market would indicate____ There is no question in my mind that he paid far more for the property than it was worth.” It was his opinion that the highest and best use for the subject property as of the assessment date was as a rental apartment complex.
After analyzing the buyer’s motive for purchasing this property, the mortgage financing, the building code violations, the high vacancies and the fact that, as of the date of purchase, this property was yielding only an approximate 5% return, plaintiff’s expert concluded that the purchase price did not represent *460 its true market value. He additionally concluded that by reason of the market’s collapse as of the assessing date, not only for condominiums but also for apartment complexes, it would be too speculative to utilize the market approach to ascertain true value.
Defendant’s expert also considered the subject’s highest and best use to be as a rental apartment complex. In his market approach to value he considered as comparable the subject sale plus three other sales, to wit: Southgate Apartments, a 200-unit complex which was sold in 1986 for $8,200,000; Point Breeze Apartments, a 100-unit complex which was sold in September 1988 for $4,600,000 and Park Apartments, a 154-unit complex which, also, was sold in September 1988 for $6,900,000. In weighing the subject’s sale price, he gave little consideration to the impact of either the building violations or the depressed condominium market. As to the latter, in his opinion, the kitchen and floor space of the subject property were “too small to indicate conversion potential.” Of the four sales considered in his market approach, he gave the most weight to the subject’s sale.
In commenting upon the use of sales as comparables our Supreme Court in Glen Wall Associates v. Wall Tp., 99 N.J. 265, 491 A.2d 1247 (1985) stated:
[I]t is well settled that a bona fide sale of property may be indicative of the true value of the property. Such a sale, however, is not dispositive on the issue of value. We recognize that there may be instances when the sale price may not reflect true value. In such instances it is for the court to appraise the circumstances surrounding a sale to determine if there were special factors which affected the sale price without affecting the true value, [at 282, 491 A.2d 1247]
Thus, a party is free to rebut evidence of a sale price with evidence that the property’s sale price was not indicative of the property’s true value. Ibid. Therefore, to be determined is whether plaintiff’s evidence sufficiently demonstrates that the subject property’s sale price was not indicative of its true value.
Highest and best use has been defined as “the reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financial *461 ly feasible, and that results in the highest value.” American Institute of Real Estate Appraisers, The Dictionary of Real Estate Appraisal (2 ed. 1989) at 149. And as further defined, “in the context of most probable selling price; i.e. market value, another term to reflect highest and best use would be most probable use. In the context of investment value an alternative term would be most profitable use”. Society of Real Estate Appraisers, Real Estate Appraisal Terminology, (Rev. ed. 1984) at 126.
Plaintiffs expert and defendant’s expert are in agreement that the highest and best use of this property as of the assessing date was its present use, to wit: as an income-producing rental property. There is no question that the property was purchased by the partners not for its rental income, but instead, based upon their perception of its potential for condominium conversion and immediate resale as individual condominium units.
Of course, if the purchase price paid represents the market value of the property based upon its condominium conversion potential, the price would be indicative of its true value. I find, however, this not to be the case as to this sale. As testified to by Lyon and his expert witness, as of the end of August 1989, when plaintiff entered into the purchase agreement, the condominium conversion market had depressed considerably. This testimony not only was unrefuted; but, instead, it was confirmed by defendant’s expert who testified “in the time frame that Mr. Lyon had referred” it was his experience that the market in general was typical to that expressed by plaintiff in that “early in 1989, things were still looking relatively rosy in the sales of condominium units and suddenly the entire market fell out.”
Although the partner who testified had several years experience with the purchase of apartments, it was readily obvious to this court that his knowledge and expertise in converting apartments to condominiums was very limited. He had never participated in the conversion of a rental project to condominium *462 ownership; the condominiums he sold from East Orange had been converted at the time he purchased them. His experience in this phase of the real estate market was lacking and he did not recognize the condition of the market concerning conversion of apartments to condominiums and their diminished sales potential. I find, as of October 1,1989, the market’s collapse of condominium sales had the effect of eliminating the profit potential of apartments to condominium conversions.
An additional factor to be considered in determining whether a sales price represents true value is its financing. The value of property for purposes of tax assessment is in essence the value which it has in exchange for money. Hackensack Water Co. v. Div. of Tax Appeals, 2 N.J. 157, 163, 65 A.2d 828 (1949). “Moreover, because of the financing terms of a transaction the contract price may not be a true indicator of the market value of the property.” Glen Wall, supra, 99 N.J. at 282, 491 A.2d 1247. In the instant case the purchase price contained nonrecourse financing of approximately $3,000,000; more than 90% of the stated purchase price. Since plaintiff intended to immediately convert and resell the apartments as condominiums, he obviously paid little attention to the overall purchase price, but instead, was concerned solely with the amount of equity required to close. As he stated, because of the high potential for condominium sales and the low risk of only $285,000, he had an opportunity to achieve a significant gain and in effect he was acquiring an option on the property. Additionally, there is no question but that plaintiff had no knowledge concerning the property’s extensive building code violations, nor did he recognize the possibility that the apartments’ kitchen and floor spaces were “too small to indicate conversion potential.”
Whether the partnership’s agreement to purchase at the price they accepted was the result of a lack of knowledge and expertise, a case of greed, or both, is not clear; but in any event, I find that plaintiff at the time of sale was not a knowledgeable purchaser relative to the apartment-to-condominium conversion market. After considering and weighing all of the factors and testimony relevant to the sale of the subject *463 property, I find that the property’s sale price does not reflect its true market value.
I further find that the three other sales utilized by defendant’s expert in his market approach to value are entitled to very little weight as comparables. Evidence of comparable sales is effective in determining value of property for tax purposes only where there is a substantial similarity between the sale properties and the subject which permits a reasonable comparison. Venino v. Carlstadt Boro., 1 N.J.Tax 172 (Tax Ct.1980), aff’d o.b. per curiam 4 N.J.Tax 528 (App.Div.1981).
The three apartment complexes offered as comparables, which sold for $8,200,000, $4,600,000 and $6,900,000, are obviously far superior to the subject. The Southgate Apartments are twice the size of the subject property. For all three complexes there was no evidence of code violations or that their physical conditions were similar to the subject. There was no evidence that the room sizes and amenities of any of the three properties were similar to the subject. Defendant’s expert stated he was not familiar with the financing of these sales, nevertheless, in his report he listed for all three sales a financing adjustment of “equal” to the subject which was more than 90% financed. There was no evidence of rental income, expenses or net operating income of these apartment projects. In arriving at market prices for apartment complexes, it is generally acknowledged that primary consideration is given to the net operating income. Without a close examination of the underlying income and expense statements of the properties utilized it is impractical to conclude they are sufficiently similar to be utilized as comparables or to make the necessary adjustments. Additionally, no consideration was given to the collapse of the apartment sales market (as distinguished from the condominium conversion market) between the sales dates of the proposed comparables and the assessment date herein. I find that the underlying data utilized by this expert in arriving at his negative adjustments to these sales of 35%, 30% and 30%, *464 respectively, are deficient and inadequate and they fail to sustain his final opinion of market value.
Of the two methods submitted in evidence to value the subject property, I conclude that most weight is to be afforded to the income approach. When valuing income producing properties, the income approach is “generally preferred.” Parkway Village Apts. Co. v. Cranford Tp., 108 N.J. 266, 270, 528 A.2d 922 (1987). In the valuation of apartment complexes, the income approach is of preponderant influence. Fort Lee v. Hudson Terrace Apts., 175 N.J.Super. 221, 227, 417 A.2d 1124 (App.Div.1980); Rudd v. Cranford Tp., 4 N.J.Tax 236, 243 (Tax Court 1982). “The preferred valuation method for apartment buildings is capitalization of income____” Helmsley v. Fort Lee Bor., 78 N.J. 200, 214-215, 394 A.2d 65 (1978), app. dism. 440 U.S. 978, 99 S.Ct. 1782, 60 L.Ed.2d 237 (1979). In the instant case, a preference for the income approach is strengthened by the collapse of the apartment sales market between the sale dates of the proposed comparables and the assessing date herein. Moreover, the time adjustment required would be too subjective and speculative.
As heretofore noted, plaintiffs expert, by use of the income approach, arrived at a true value of $2,452,000, whereas, defendant’s expert, utilizing the income approach, initially reported a true value of $3,240,700 which at trial, by reason of adjustment to his payroll expense, he reduced to $3,113,300. The main reason for their divergent conclusions were the differences in the gross income that each utilized. Plaintiff’s expert arrived at an effective gross rental income of $571,880, whereas, defendant’s expert concluded it to be $605,340. Both experts reduced the actual 17% vacancy and collection loss to a projected 10% and computed laundry income of $4,200; the difference being in their respective determination of the economic rent also known as the “fair rental value” or “market rent.” The complex consists of 100 apartments, 68 of which are one-bedroom and 32 are two-bedroom apartments.
*465 Plaintiff’s expert utilized the actual rent roll as of October 1, 1989 and multiplied it by 12 to arrive at his figure. Conversely, defendant’s expert calculated the fair rental value by establishing a value derived from the highest rent that would be charged for these respective one-room and two-room apartments to a tenant entering into a new lease on the assessment date, to wit: $525 month for one-bedroom apartments and $625 a month for two-bedroom apartments and, allegedly, comparing those amounts with rentals that were then being charged at other apartments within the area. He accepted these highest rents as the proper economic rents. In Parkway Village, supra, our Supreme Court stated:
Central to an income analysis is the determination of the economic rent, also known as the “market rent” or “fair rental value.” In Parkview Village Associates v. Collingswood, supra, 62 N.J. [21] at 34 [297 A.2d 842 (1972) ], in determining fair rental value for purposes of the capitalized income method of property valuation, we held:
“In the absence of convincing evidence to the contrary the current ongoing income scale of a large, well-managed apartment project like this, functioning as customary with leases of relatively short length, should be deemed prima facie to represent its fair rental value for purposes of the capitalized income method of property valuation. A court or taxing agency should be most hesitant to find that the tenants of a residential property being operated commercially are being charged inadequate rent.”
Our holding was based on the belief that landlords of well-managed apartment complexes maximize their profits and minimize their expenses. We also concluded that this approach “conduces to the objective of relative stability of assessments which we have heretofore held to be basic to sound tax assessment policy. Id. at 34, 35 [297 A.2d 842],
This principle has been consistently followed. In Glen Wall Associates v. Wall Township, 99 N.J. 265, 275-76 [491 A.2d 1247] (1985), we specifically reaffirmed our holding in Parkview.” [108 N.J. at 270-271, 528 A.2d 922]
In the instant case the owners utilized professional management to operate the apartments. There is no claim nor was any evidence submitted that the project was not well managed. Here, there is no allegation or evidence that plaintiff has not maximized its rents or that it has favored long-term tenants; nor is there any evidence that the contract rents are too low. The proofs established that the apartments were extensively advertised, yet it had an actual rental and collection loss of 17%. Defendant’s expert agrees with plaintiff’s expert that a vacancy factor of 10%, which is rather high for rental apartment *466 projects, is correct for this operation. The high vacancy rate does not lead to an inference that the contract rents are too low. The taxing district presented no analysis of actual rent increases at the complex for each type of unit as of the assessing date, nor evidence of when the existing leases commenced and expired; their expert merely utilized the highest renewal rentals as of the assessing date and adopted them as the property’s economic rent.
The nine apartment complexes used by defendant for rental comparables were all located outside of the subject municipality. All are in East Windsor Township, Mercer County on the opposite side of Trenton from the subject, which is in Burlington County. The rentals for all these comparables ranged from a low of $580 a month to a high of $670 a month. It was not established whether these figures represented the alleged comparable’s contract rents or the highest rentals charged as of the assessing date, the latter of which was rejected in Parkway, supra. There was no proof that rentals in Bordentown Township were identical to rentals in East Windsor, nevertheless, no adjustment for location was made. Defendant’s expert did not offer any descriptions or sizes of the comparable apartments or of the subject’s apartments. Due to insufficient evidence this court cannot evaluate whether there is substantial similarity between the sale apartments and the subject. How he adjusted these rentals to an alleged economic rent of $525 and $625 respectively for the subject is not clearly stated.
It is noted that, although this expert in his market approach was cognizant of the existence of two apartment projects located within the defendant township and one in the adjoining city of Bordentown, he failed to consider the rentals from these alleged comparable sales in arriving at his economic rent for the subject property.
The weight to be given to an expert’s conclusions depends upon the facts and reasoning which form the basis for his opinion. Buckelew v. Grossbard, 87 N.J. 512, 524, 435 A.2d 1150 (1981); Passaic v. Gera Mills, 55 N.J.Super. 73, 89, 150 *467 A.2d 67 (App.Div.1959); Berkeley Dev. Co. v. Berkeley Heights Tp., 2 N.J.Tax 438, 444 (Tax Ct.1981). As reiterated by our Supreme Court in Johnson v. Salem Corp., 97 N.J. 78, 477 A.2d 1246 (1984):
There are, however, limits to the permissible inferences that may be extracted from experts’ testimony. “The weight to which an expert opinion is entitled can rise no higher than the facts and reasoning upon which that opinion is predicated.” N.J. Rules of Evidence (Annot.1984), comment 7 to Evidence Rule 56, at 360. [at 91, 477 A.2d 1246]
I find that the data furnished by defendant’s expert in arriving at his alleged economic rents fail to support his conclusions. His economic rents are identical to the highest contract rents renegotiated on the assessing date for each respective type of apartment and I conclude that these projected rents of the subject, and not the rents from the nine comparables, formed the basis of his conclusion of economic rents. I find that his testimony of alleged economic rents appears to be an attempt to circumvent the holding set forth by our Supreme Court in Parkway Village, supra.
I reject defendant-expert’s projection of the subject’s rental income and find that the correct market rent is as posited by plaintiff’s expert, to wit: $630,756. Deducting therefrom the agreed 10% vacancy factor and adding the laundry room income of $4,200 results in an effective gross income of $571,880.
Next to be determined is the proper expenses to be allowed. Plaintiff’s expert [hereinafter referred to as plaintiff] used total expenses of $253,366, whereas defendant’s expert [hereinafter referred to as defendant] claimed that $228,630, which at trial he increased from his report of $218,305, is the correct total amount that should be utilized.
Plaintiff’s allocation for utility expenditures of $106,858 was the actual annual amount expended for the subject property. Defendant used a stabilized figure of 15% of effective gross income or $90,750—$16,108 less than plaintiff’s figure. Upon cross-examination, defendant acknowledged that he had not realized that, unlike the normal apartment project, for these *468 apartments the landlord and not the tenant pays for all tenant’s cooking gas charges. An average annual charge of $161 an apartment does not appear to be unreasonable, therefore, I accept plaintiff’s utility expense of $106,858.
Both experts accepted the actual expenses for insurance premiums of $10,358; the cartage cost of $10,987 and the snow removal payments of $5,088.
Both experts stabilized the actual payroll expenses and taxes of $29,380 and $6,043, respectively. Plaintiff allocated $23,100 for salaries and added $2,825 for payroll taxes for a total payroll expenditure of $25,925. Plaintiff’s amount was calculated by allocating a superintendent’s salary of $300 a week, to which was added payroll taxes plus $7500 for the rental value of the superintendent’s apartment. (The apartment’s rental value was included within the estimated gross income). Conversely, defendant allowed 2.4% of his projected effective gross income for payroll to arrive at a total $14,520 with no credit given for the rental value of the superintendent’s apartment nor a deduction for payroll taxes. At trial, defendant amended his appraisal, testifying that an apartment manager does not normally pay rent for his apartment and that actual payroll taxes should be included as a proper expense, thereby increasing his total payroll expenses to $24,845 or $1,080 less than plaintiff's figure. I find that $25,925 is the correct amount to be utilized for this item.
Both expert’s utilized a stabilized percentage of the effective gross income to arrive at the proposed management expense. Plaintiff used 5% to arrive at $28,594 and defendant allowed 4.5% or $27,225 which he testified was toward the high end of a normally accepted 3% to 5% range. Defendant admitted that because of the increased collection problems (the actual vacancy and collection loss is a high 17%), this property would be more difficult to manage than the average apartment complex. For this reason I accept plaintiff’s management expense of 5%.
*469 The experts were extremely close in their allocation for repairs and maintenance. Plaintiff’s figure is a stabilized 7V2 of effective gross income whereas defendant relied upon the project’s actual expenditures. Considering that the actual repairs and maintenance expenses incurred admittedly included deferred maintenance, this item should not exceed the actual amount expended, therefore, defendant’s figure of $41,227 will be used.
The actual cost for landscaping was $7,290 which plaintiff stabilized at $2500; he allocated the actual expenses of $3,430 to advertising; $2,291 to telephone and $8,124 to professional and miscellaneous fees, for a total of $16,345. For these miscellaneous items defendant allowed a combined expense of $18,150. Since the taxpayer’s estimate is less than the taxing district’s, the lesser amount will be accepted.
Plaintiff projects a rental office expense of $6,300 stating that a one-bedroom apartment is actually used as an office. No separate allocation was given for this item by defendant who claims no allowance should be made for it as an operating expense since it was unnecessary for a 100-unit apartment complex to have a separate rental office in addition to a superintendent’s apartment. I accept defendant’s reasoning, therefore, this extra expense item will be denied.
Both experts derived capitalization rates by band-of-investment calculations with plaintiff arriving at an overall rate of 12.99% and defendant at 12.1%, the difference being defendant’s use of a 1.495% adjustment for appreciation. This adjustment was based on a projected ten-year term appreciation of 2.5%. I accept defendant’s reasoning to be more persuasive, therefore, an overall capitalization rate of 12.1% will be utilized.
In summary the above findings result in the following calculations:
Total Effective Gross Income $571,880
Less Total Expenses
Utilities $106,858
Insurance Premiums 10,358
*470 Cartage $10,987
Snow Removal 5,088
Payroll & Payroll Taxes 25,925
Management 28,594
Repairs & Maintenance 41,227
Landscaping, Advertising, Telephone, Professional and Miscellaneous Fees 16,345
Total Expenses $245,382
Net Operating Income $326,498
Capitalized at 12.1% True Value = $2,698,330
The ratio of the assessment to the property’s true value exceeds the upper limit of the taxing district’s chapter 123 ratio, therefore, the assessment will be revised by applying the district’s average ratio of 65.49% which results in an assessment of $1,767,136. N.J.S.A. 54:51A-6(a).
It is directed that judgment for the tax year 1990 be entered as follows:
Land $ 245,000
Improvements 1,522,136
Total $1,767,136

The $13,000 discrepancy between the alleged contract price and the total of these items was not clarified.