38 A.3d 686 (2012)
424 N.J. Super. 516
BOROUGH OF SADDLE RIVER, Plaintiff-Appellant/Cross-Respondent,
v.
66 EAST ALLENDALE, LLC, Defendant-Respondent/Cross-Appellant.
Docket No. A-2886-10T3
Superior Court of New Jersey, Appellate Division.
Argued February 14, 2012.
Decided March 26, 2012.
*688 Shapiro, Croland, Reiser, Apfel & Di Iorio, LLP, attorneys for appellant/cross-respondent *689 (Stuart Reiser, of counsel and on the brief; Jay D. Rubenstein, Hacken-sack, on the brief).
Bathgate, Wegener & Wolf, attorneys for respondent/cross-appellant (Peter H. Wegener, Lakewood, on the brief).
Before Judges A.A. RODRÍGUEZ, SABATINO, and FASCIALE.
The opinion of the court was delivered by
FASCIALE, J.A.D.
In this condemnation action, plaintiff Borough of Saddle River (Saddle River) appeals from a final judgment in the amount of $5,250,000, a January 7, 2011 order denying its motion for a new trial or, in the alternative, remittitur, and a July 26, 2010 order denying its motion in limine to bar expert reports and testimony. Defendant 66 East Allendale, LLC (defendant) cross-appeals from that portion of the final judgment awarding simple interest. We affirm on the appeal and cross-appeal.
This appeal requires us to determine if the trial judge correctly made his threshold determination that "the record contains sufficient evidence of a probability of a zoning change to warrant consideration by the jury," as required by State, by Commissioner of Transportation v. Caoili, 135 N.J. 252, 261-62, 639 A.2d 275 (1994). We are also called upon to address whether the judge erred by making his threshold determination before summations, rather than before the commencement of the trial.
We conclude that the judge did not err in finding that there was sufficient evidence of a reasonable probability of a zoning variance to allow the jury to consider that probability in its assessment of the fair market value of the property. Although it is preferable to make the threshold determination before the trial begins, we hold that, given the estimated seven-day evidentiary hearing needed to perform his gatekeeping role, the judge did not abuse his discretion by making his findings before summations.

I.
In December 2002, defendant purchased a 2.13 acre vacant parcel located at 66 East Allendale Road, the corner intersection of East Allendale Road and West Saddle River Road.[1] At that time, Exxon Mobil leased the property and sublet for operation of a gas station. In 2005, Exxon removed the gas station, cleaned up existing contamination, and vacated.
Under the Borough's current zoning ordinance, the subject property is "split-zoned" with approximately 31,799 sq. ft. in the office zone (O-1) and approximately 60,984 sq. ft. in the residential zone (R-1).[2] In the O-1 zone, the ordinance restricts improved lot coverage to 30% of the lot's total area, and imposes parking requirements of one parking space for every 75 sq. ft. of space.
In October 2004, defendant sought a construction permit for use of the R-1 *690 portion of the property as a parking lot of a proposed 10,000 sq. ft. bank building. The application relied on a site plan prepared by defendant's planning expert David A. Hals. The permit was denied, noting that the "proposed improved lot coverage exceeds the maximum allowed of 30%." Defendant appealed to the zoning board to seek a "use" variance based on the same site plan. After a zoning board hearing at which several people voiced opposition to the proposed 10,000 sq. ft. building, defendant withdrew the application without any action by the board.
On November 8, 2006, Saddle River filed a verified complaint to acquire defendant's property by authority of eminent domain to use as a public park. After unsuccessful mediation pertaining to the legality of the taking, the court entered a consent order for judgment and appointed three commissioners, who subsequently appraised the property at $1,593,625. The court then entered an order memorializing this valuation.
The parties appealed, demanded a jury trial, and filed motions in limine to bar expert opinions. Saddle River contended that the court should strike the reports and testimony at trial of defendant's four proposed expert witnesses as "net opinion" or, in the alternative, "conduct a plenary hearing in advance of trial pursuant to ... Caoili, [supra,] 135 N.J. 252 [639 A.2d 275]." Similarly, defendant argued that the court should bar the report and testimony of Saddle River's appraisal expert as "net opinion." On July 6, 2010, Judge Robert L. Polifroni conducted oral argument and issued an oral opinion denying the motions. On July 26, 2010, the judge entered an order memorializing his decision.
Thereafter, in October and November 2010, Judge Polifroni conducted a ten-day jury trial, during which time the parties presented testimony from eleven witnesses and introduced 117 documentary exhibits. The central dispute at trial, and now on appeal, was whether a willing purchaser utilizing the property for its "highest and best use" would have considered that there was a "reasonable probability" that the local zoning board would grant a variance from the 30% improved lot coverage restriction to allow construction of a 10,000 sq. ft. bank building. Such a building would have substantially increased the fair market value of the property and, therefore, the amount of just compensation due for the taking.
At trial, defendant relied on the expert opinion of Hals, who produced a 2010 planning and engineering report. Hals opined that if parking were provided underneath the building, a prospective purchaser could construct the 10,000 sq. ft. building within the O-1 area without seeking variance from the 30% coverage restriction. However, Hals further opined that a better use would be to position the 10,000 sq. ft. building within the O-1 area and provide parking in the R-1 area. This plan would have required a "use" variance for the parking[3] and a "bulk" variance for 42% improved lot coverage. Hals concluded:
It would be likely that the ... variance for the improved lot coverage would be granted by the Zoning Board of Adjustment. The proposed building size and development layout is an appropriate sized development for the property. The proposal is not over[-]building of the property. The proposed building coverage *691 is 7.11% which is consistent to the 7% residential building coverage....
Defendant also presented testimony from appraiser Jon Brody, who performed an analysis of market data from comparable properties whose highest and best use was a bank site. Based on this "market approach" and his review of Hals' 2010 planning report, Brody determined that the property had a value of $5,250,000. He stated:
We have considered the facts demonstrating the probability of a variance as they would be considered by a buyer and seller and conclude that the parties would anticipate the variance to develop the property as a bank/office facility consistent with the physical characteristics of the property and densities derived from the market[,] which ... would accommodate and permit a two (2) story 10,000 square foot bank/office with adequate on-site parking.
In his report, Brody accounted for "the factors indicative of an impending variance, neighborhood development trends, and conclusions discussed in [Hals' 2010] planning report." Additionally, he stated that he had not valued the subject property "on the assumption that the variance is an accomplished fact[,] but rather the valuation represents the value of the unapproved land, taking into account as a factor in valuation, its probable variance, which we believe to be reasonably probable." Finally, defendant also presented the testimony of Shergoh Alkilani, a real estate and bank development expert, who opined that the high-income demographics of the area would have made the property particularly valuable for a bank site.
Saddle River relied on the opinion of planning expert Richard Preiss, who agreed that the highest and best use of the property was for a bank building. However, Preiss opined that the zoning board would not have granted the bulk variance needed for a 10,000 sq. ft. bank building because a smaller building could have been constructed. Preiss relied, in part, on a conceptual site plan prepared by Saddle River's engineer, Martin K. Spence, showing a 3,312 sq. ft. bank building meeting the existing lot coverage requirement.[4] Relying in part on Preiss' planning report, Saddle River's appraiser, Hugh A. McGuire, Jr., testified that the property had a market value of $1,325,000.
On November 3, 2010, the jury returned a verdict in favor of defendant in the amount of $5,250,000. On January 7, 2011, Judge Polifroni denied Saddle River's request for a new trial, issued an oral opinion, and entered an order for final judgment. Thereafter, Saddle River appealed and defendant cross-appealed.

II.
On appeal, Saddle River contends that the judge wrongly denied its motion for a new trial. As at the time of its motion, Saddle River's primary contention is that the judge erred by not determining, prior to the commencement of trial, whether there was a "reasonable probability" that the local zoning board would have approved a variance from the existing lot coverage restriction. Saddle River argues that the judge did not adequately "serve as a `gate-keeper' and determine, in advance of the trial, as an issue of law, if there exist[ed] a `reasonable probability' that all essential statutory criteria required to approve a `bulk' variance under N.J.S.A. 40:55D-70c[5] ha[d] been established by *692 competent evidence." Thus, Saddle River contends that the judge "improperly and prejudicially allowed [defendant's experts] to testify on issues of law before the jury and permitted the jury to decide those issues of law as a matter of witness credibility."
We address the governing legal principles regarding new trial motions and condemnation actions. Generally speaking, granting or denying a motion for a new trial rests with the sound discretion of the trial court and should only be granted if, "`having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law.'" Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 521, 20 A.3d 1123 (2011) (quoting R. 4:49-1(a)). "A jury verdict is entitled to considerable deference and `should not be overthrown except upon the basis of a carefully reasoned and factually supported (and articulated) determination, after canvassing the record and weighing the evidence, that the continued viability of the judgment would constitute a manifest denial of justice.'" Ibid. (quoting Baxter v. Fairmont Food Co., 74 N.J. 588, 597-98, 379 A.2d 225 (1977)). Furthermore, trial courts cannot substitute their own judgment merely because they would have reached a different conclusion. Dolson v. Anastasia, 55 N.J. 2, 6, 258 A.2d 706 (1969).
We apply to the new trial motion the same review standard that the trial judge applied, i.e., "whether there was a miscarriage of justice under the law." Risko, supra, 206 N.J. at 522, 20 A.3d 1123 (citing Bender v. Adelson, 187 N.J. 411, 435, 901 A.2d 907 (2006)). At the same time, we give "`due deference' to the trial court's `feel of the case.'" Ibid. (quoting Jastram v. Kruse, 197 N.J. 216, 230, 962 A.2d 503 (2008)).
Pursuant to the Eminent Domain Act of 1971, N.J.S.A. 20:3-1 to -50, to take private property, the State must pay the property owner "just compensation." Caoili, supra, 135 N.J. at 260, 639 A.2d 275 (citing N.J. Const. art. I, ¶ 20). "Just compensation" means "`the fair market value of the property as of the date of the taking, determined by what a willing buyer and a willing seller would agree to, neither being under any compulsion to act.'" Ibid. (quoting State v. Silver, 92 N.J. 507, 513, 457 A.2d 463 (1983)). In other words, it is the amount that "`knowledgeable parties freely negotiating for its sale under normal market conditions based on all surrounding circumstances at the time of the taking.'" Ibid. (quoting Silver, supra, 92 N.J. at 514, 457 A.2d 463).
Furthermore, the property owner "shall receive the fair market value of the land for any use for which it has a commercial value in the immediate present or in reasonable anticipation in the near future." State v. Gorga, 26 N.J. 113, 116, 138 A.2d 833 (1958). Thus, the property's "highest and best use" is "most relevant in ascertaining fair market value," and any applicable zoning restrictions constitute "material factors." Caoili, supra, 135 N.J. at 260, 639 A.2d 275. The Court has pointed out:
Because the inquiry into the uses of property is usually wide-ranging, "courts in [New Jersey] have shown considerable liberality in admitting evidence of *693 market value, particularly in terms of the highest and best use of the subject property." That evidence encompasses all "relevant facts at the time of the taking[, which] may include those that have a bearing on an available future use of the property."
[Id. at 260-61, 639 A.2d 275 (second alteration in original) (citation omitted) (quoting Silver, supra, 92 N.J. at 515, 457 A.2d 463).]
Nonetheless, "allowing consideration of all zoning changes that [are] merely possible could lead to `unbridled speculation.'" Id. at 261, 639 A.2d 275 (quoting Gorga, supra, 26 N.J. at 116, 138 A.2d 833). Thus, the Court has developed "a two-step standard governing the consideration of evidence of zoning changes affecting the future use of property":
"[I]f as of the date of taking there is a reasonable probability of a change in the zoning ordinance in the near future, the influence of that circumstance upon the market value as of that date may be shown," but ... before allowing a jury to consider the issue, the trial court should first decide whether the record contains sufficient evidence of a probability of a zoning change to warrant consideration by the jury.
[Id. at 261-62, 639 A.2d 275 (quoting Gorga, supra, at 116-17, 138 A.2d 833).]
As such, the judge must be "satisfied that the evidence is sufficient to warrant a determination that such a [zoning] change is reasonably probable," and then the jury may consider the change "in fixing just compensation in light of the weight and effect that reasonable buyers and sellers would give to such evidence in their determination of the fair market value of the property." Id. at 265, 639 A.2d 275.
Caoili defines the role of the trial judge as that of a "gatekeeper" who "screen[s] out potentially unreliable evidence and admit[s] only evidence that would warrant or support a finding that a zoning change is probable." Id. at 264, 639 A.2d 275. This gatekeeping function assures that the jury bases its fair market valuation upon "cogent evidence indicating beyond a mere possibility that a change of use is likely and ... would be an important factor in the valuation." Ibid.
However, the jury "need not be required to find that the zoning change is probable." Ibid. In Caoili, the Court explained:
[I]n the jury's consideration of evidence of a zoning change, the critical inquiry is the reasonable belief by a buyer and seller engaged in voluntary negotiations over the fair market value of property that a change may occur and will have an impact on the value of the property regardless of the degree of probability.... [E]ven though the parties to a voluntary transaction may not believe that a zoning change is more likely than not, their belief that there may be a change should be taken into account if that belief is reasonable and it affects their assessment of the property's value.
[Id. at 264-65, 639 A.2d 275 (internal quotation marks omitted).]
We have had numerous opportunities to consider the guidance of Gorga and Caoili.[6] In this case, Saddle River relies extensively *694 upon County of Monmouth v. Hilton, 334 N.J.Super. 582, 760 A.2d 786 (App.Div.2000), and State ex rel. Commissioner of Transportation v. 200 Route 17, L.L.C., 421 N.J.Super. 168, 22 A.3d 1012 (App.Div.), certif. denied, 208 N.J. 601, 34 A.3d 782 (2011). We are not convinced, however, that these cases heighten the standard of proof by which the trial judge, in his or her gatekeeping role, must screen out unreliable evidence and assure that proofs are sufficient to warrant a determination that a zoning change is reasonably probable.
In Hilton, supra, 334 N.J.Super. at 591, 760 A.2d 786, we considered "the effect on market value of a prospective assemblage of disparately owned parcels," an issue that the court found "conceptually no different from the effect on market value of a prospective zoning change." The court held that "appraising the value of defendant's property as if a four-lot assemblage had already taken place as of the date of taking and then basing highest and best use on such an assemblage constituted a fundamentally untenable and legally unsupportable approach." Id. at 590, 760 A.2d 786. Thus, "the reasonable probability of an assemblagenot merely a future assemblage that is hypothetical or speculativemay enhance the fair market value... [b]ut it cannot be the basis for determining market value as if the assemblage had already taken place." Id. at 591, 760 A.2d 786. The court further explained that
a jury would have to determine the degree of probability of the assemblage since ... the more probable the desired event is, the more valuable that probability is to a buyer and the greater the premium he would therefore be willing to pay. In this regard, we understand that what Caoili [, supra, 135 N.J. at 264-65, 639 A.2d 275,] meant ... respecting "an impact on the value of the property regardless of the degree of probability" was addressed to the court's gatekeeping function and not to the jury's determination. That is to say, the judge, in determining probability, need not determine degree of probability so long as there is reasonable probability, but the jury may consider the degree of probability, as indeed it must, in determining the extent of the premium the buyer would be willing to pay.

*695 [Id. at 594, 760 A.2d 786.]
Similarly, in 200 Route 17, supra, 421 N.J.Super. at 172, 22 A.3d 1012, we considered whether an expert could testify as to the property's value as a commercial retail use based on a speculative renovation, instead of the existing physical condition. The court stated:
Ultimately, the issue can be restated as follows: What would a willing buyer pay a willing seller, without compulsion, for a substandard building, knowing that the buyer would be obligated to obtain appropriate land use and building approvals, as well as spend 1.5 million dollars for the property to achieve its highest and best use? This is different from defendant's expert's approach, which entailed simply assuming that the building was already improved and then deducting the costs of improvement.
[Id. at 175, 22 A.3d 1012.]
We held that "[s]peculative improvements to the property, that do not exist on the valuation date, cannot be considered in valuing this property." Id. at 178, 22 A.3d 1012. The court explained:
[T]he State is required to pay for the building "as is," considering the reasonable probability of future renovations and approvals required to improve the property to its highest and best use, discounted by the risks and costs of such venture, just as a buyer would pay for the building in its current condition, then make any improvements necessary to bring the building to the buyer's desired use.
[Id. at 179, 22 A.3d 1012.]

III.
Under the facts of this case, we reject Saddle River's contention that Judge Polifroni erred by making his Caoili threshold determination after the trial began. When Saddle River initially moved to bar defendant's experts, the judge denied the motion and issued an oral decision expressing the following reasons:
[I]t's clear to me, as I'm reviewing these documents, that I am not in a position at this point to rely upon cross-examinations and examinations of witnesses at depositions in order to rule as a matter of law that the opinions ... are of insufficient foundation to allow it to get to the jury. It's not that type of case and I think it requires a full exposition of the facts at trial.
Now I do not believe that [Caoili, supra, 135 N.J. 252, 639 A.2d 275] or any other case that I've seen requires me, as the gatekeeper, to have an expansive hearing[[7]] prior to trial in order to fully vet these issues. My authority as a trial [j]udge under [N.J.R.E.] 611 is [that] I can determine what's the most efficient use of my time, the [c]ourt's time, counsel's time, the parties' time, and the jury's time in terms of time and expense.
I do not think it serves the proper administration of justice to have a dry run, to have all of these issues vetted outside the presence of the jury so that the [c]ourt would be in a better position to decide whether or not the opinions are viable or not viable at least in terms of the issues raised in this case.
....

*696 [T]his is not the type of case where the jury hears information and it's of such a nature that they're incapable of putting it aside, that they'll be so shocked by what they hear that it's not reasonable for them to follow instructions of the [court] as to what they consider and [do] not consider.
At the close of evidence, before summations, Saddle River renewed its motion to strike the testimony of Hals and Steck on the issue of the reasonable probability of a zoning change. Judge Polifroni denied the motion and found that "there's enough ... of a finding of a reasonable probability of a potential zoning change, as I understand the law in Caoili." The judge explained:
I simply point briefly to the prior ... zoning change that was proffered. The weight of that, the political issues behind that by the planner is [sic] well before this jury. Nevertheless, ... this potential zoning change was considered by the Borough [of Saddle River] at least once.
Secondly, the [c]ourt also points out[,] as I'm permitted to do[,] that ... the evidence as to other zoning changes during the pendency of the issues involving [Saddle River] and defendant were brought before the town officials and they considered zoning changes.... I can consider those type of non[-]evidentiary issues from my gatemy threshold findings, as I do in any rulings on evidence.
[T]here are also indications that this Borough has made zoning changes to office portions of their zoning and the issues of ... the commercial zone and the office zone and the preexisting use and the difficulties of the split[-]zoning[,] and for all those issues I reject [Saddle River]'s motion to strike the testimony of those various experts and that issue will be presented to the jury for their consideration. That is, they may consider the possibility of a zoning change, that would, therefore, impact the value of the property.
Accordingly, Judge Polifroni charged the jury that "to determine fair market value, you should consider the legal use or development of the property, which is reasonably probable, which might prompt a buyer to pay and what an owner might reasonably expect to receive from selling the property knowing the legal limitations [a]ffecting the property." He instructed:
Zoning, planning, and building laws and regulations limitdo limit the way a property may be used[;] however, you must consider whether the zoning restrictions may be changed or a variance obtained in order for the highest and best use to be realized. Now suppose there were indications that the law regulating the propert[y's] use might change so as to permit a use or limit a use for the development of the property in the future which would make the property more or less valuable. Parties negotiating a price for the property's sale on the date of taking would not simply ignore the probabilities of that change, and neither should you.
....
It is for you the jury to evaluate the evidence to determine what a reasonable buyer and seller would anticipate a reasonable zoning board would do and how that prospect of a zoning change in the near future would impact on the properties market value on the date of the taking.... Your finding as to the value of the property should reflect the remoteness or likelihood of approval of the proposed zoning changes to the same extent that a reasonable buyer and seller would consider them in determining the value of the property on November 8[], 2006.
*697 Following the verdict, upon Saddle River's motion for a new trial, Judge Polifroni addressed whether he had erred "in [his] initial determination that adequate competent evidence existed to support the finding of a reasonable probability of a zoning change...." The judge reviewed the relevant case law, including Gorga and Caoili, denied the motion, and issued an oral opinion:
In performing the gate[-]keeping function[,] this [c]ourt determined [before the final jury charge] that there was sufficient evidence to establish that relief from the zoning restrictions [was] probable. And that the evidence was such that a jury could reasonably conclude that a zoning change may occur.
For example, the only other time the 30[%] lot coverage waswas considered for office space in the PUD Zone, the Borough [of Saddle River] changed the regulation backto the 65[%] coverage regulation in order to make the project economically feasible.
The [c]ourt further notes [Hals]'s opinion that the proposed 10,000-square-foot building could have been constructed solely on the O1-Zone portion of the property. But he opined that the proposed site plan was a more prudent plan.
Additionally, there are other circumstances supporting defendant's view, that reasonable buyers would anticipate zoning changes. As noted by the defendant there's no property governed by the O1-Zone that complied with the maximum improved lot coverage limitation of 30[%]. Further, the properties surrounding the subject property contained deficiencies in the improved lot restriction.
And additionally, there was sufficient evidentiary support based upon the location of the subject property that prior rulings of the Borough [of Saddle River] with respect to allowing the deviation from the 30[%] coverage requirement demonstrated that both positive and negative criteria mandated by N.J.S.A. 40:55D-70c(2) would have been met. Therefore there was nothing in the record to indicate that the expert opinions were wrongfully presented to the jury.
Further, there is evidence to demonstrate that the proposed plan conforms to the physical properties. And do[es] not unduly impact upon the residential properties that abut it.
Based upon this information the potential purchaser would likely believe that the Borough [of Saddle River] would grant requested relief in form of a variance or zoning change. Specifically[,] as noted by defendant[,] the prior development of [the] district was all between 65[%] and 80[%] of the buildable area of all of the properties in the district.
Further[,] the evidence in the record reflecting opposition to zoning changes under the political circumstances existing at one point in time in the past is not dispositive of this issue as it relates to future zoning changes. The jury was exposed to extensive evidence about the political machinations. And clearly found that the Borough [of Saddle River]'s resistance to zoning changes at that time did not settle the issue.
The [c]ourt finds that there was cogent evidence to warrant a determination that the zoning change was reasonably probable. And based upon the aforementioned facts ... the [c]ourt reiterates its ruling that it was reasonable for a jury to conclude that the zoning change ... may occur, which was the directive of Caoili [, supra, 135 N.J. at] 264 [639 A.2d 275].
....

*698 And the negative criteria was demonstrated by the fact that there were no residences within a half of [a] mile on the south-side. And that the distance ... homes to the north were protected by a substantial stand of evergreen trees.
We conclude that the judge did not abuse his discretion in deciding that the evidence was sufficient to warrant a determination by the jury that a zoning change was reasonably probable. Caoili simply requires that the judge be satisfied that the evidence is not unduly speculative by "screening out potentially unreliable evidence and admitting only evidence that would warrant or support a finding that a zoning change is probable." Id. at 264, 639 A.2d 275. Here, the judge found sufficient credible evidence indicating that a buyer and seller at the time of the taking would have considered the probability of a zoning change affecting the value of the property. The evidence therefore was not unduly speculative or potentially unreliable. Ibid.
This is not a case such as Hilton or 200 Route 17, where evidence of the reasonable probability of a particular change was patently speculative. In Hilton, supra, 334 N.J.Super. at 591, 760 A.2d 786, for example, the expert appraised the property as if a future hypothetical assemblage had already taken place at the time of the taking. Likewise, in 200 Route 17, supra, 421 N.J.Super. at 178-79, 22 A.3d 1012, the expert valued the property based on speculative improvements to the existing building that had not yet occurred, a potential "windfall" for the defendant at the expense of the State. In those cases, the courts were justifiably concerned that valuation was based on an assumption that the potential change had already occurred, rather than what a buyer and seller would pay for a potential change that was at least reasonably probable as of the time of the taking. We too recognize that "[t]he distinction between enhancing market value and constituting the basis of market value is ... critical[.]" Hilton, supra, 334 N.J.Super. at 591, 760 A.2d 786; 200 Route 17, supra, 421 N.J.Super. at 175, 22 A.3d 1012.
Here, in contrast to the facts of Hilton and 200 Route 17, there was a sufficient basis to determine there existed a reasonable probability that the zoning board would have granted the variance. For example, Judge Polifroni found that no other property in the O-1 zone complied with the improved lot coverage restriction; that a 10,000 sq. ft. building would not unduly affect the residential area; that such a building could have been constructed solely within the O-1 zone, notwithstanding that a better use would have required the bulk variance; that the property's location could have supported the statutory positive and negative criteria; and that Saddle River had previously increased maximum improved lot coverage in the O-1 zone. Thus, the judge sufficiently fulfilled his gatekeeping function before permitting the jury to consider in deliberations Brody's valuation of the property with the probability of a variance.
We note also that because the jury was not bound by any particular degree of probability, Caoili, supra, 135 N.J. at 264-65, 639 A.2d 275, it was equally free to consider the property value proposed by Saddle River's expert. That the jury ultimately did not accept that valuation is neither for us nor the trial judge to second-guess. See Risko, supra, 206 N.J. at 521-22, 20 A.3d 1123. We conclude that the judge correctly instructed the jury that in determining the appropriate fair market value to represent just compensation, it could consider the reasonable probability that the zoning board may have approved a bulk variance.
*699 Although it is preferable for a judge to make the threshold determination prior to the commencement of the trial, we do not read Caoili to require that the judge must, in every case, conduct a plenary hearing before the trial begins. We recognize that in Hilton we stated in dicta that
[t]he rule as enunciated by Caoili requires that the judge make a threshold determination as to whether the prospective zoning change is reasonably probable in the near future. If the judge is satisfied that the preliminary showing has been made, the evidence of probable change is admitted [into evidence.]
[Hilton, supra, 334 N.J.Super. at 592, 760 A.2d 786.]
Here, the parties moved pretrial to have the court make the probability determination based on testimony and reports from five proposed experts. The judge estimated that resolution of the issue would potentially require a seven-day evidential hearing, constituting an inefficient use of time. Under the facts presented, we conclude that the judge did not abuse his discretion by performing his gatekeeping function before summations.
As with any other evidence inappropriate for the jury room, the judge may instruct the jury to disregard proofs that fail to meet the threshold standard of sufficiency. See Johnson v. Salem Corp., 97 N.J. 78, 98, 477 A.2d 1246 (1984) (stating that "juries frequently are instructed to disregard certain evidence they have heard"); cf. Verdicchio v. Ricca, 179 N.J. 1, 36, 843 A.2d 1042 (2004) (finding no reason to believe that the jury disregarded the trial court's instructions not to consider improper statements). "[J]uries routinely demonstrate their ability to successfully perform difficult intellectual exercises requiring shifts of perspective in the course of their deliberations." Johnson, supra, 97 N.J. at 98, 477 A.2d 1246.

IV.
Next, Saddle River argues that the judge erred by denying its motion in limine to bar the opinions of defendant's experts. Saddle River contends that defendant's planning experts, Hals and Steck, offered net opinion and failed to support the conclusion that a 10,000 sq. ft. bank building would be "a better zoning alternative." Saddle River also argues that the judge should have excluded Brody's appraisal opinion because it was based on Hals' net opinion.
"The net opinion rule is a prohibition against speculative testimony." Grzanka v. Pfeifer, 301 N.J.Super. 563, 580, 694 A.2d 295 (App.Div.1997), certif. denied, 154 N.J. 607, 713 A.2d 498 (1998). "Under this doctrine, expert testimony is excluded if it is based merely on unfounded speculation and unquantified possibilities." Vuocolo v. Diamond Shamrock Chems. Co., 240 N.J.Super. 289, 300, 573 A.2d 196 (App.Div.), certif. denied, 122 N.J. 333, 585 A.2d 349 (1990). Thus, the trial court may not rely on "an expert's personal `rule of thumb' regarding fair market valuation." Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 372-73, 25 A.3d 221 (2011) (quoting Alpine Country Club v. Borough of Demarest, 354 N.J.Super. 387, 395-96, 807 A.2d 257 (App. Div.2002)). "An expert is required to give the `why and wherefore' of his or her opinion, not just a mere conclusion or speculation." Riley v. Keenan, 406 N.J.Super. 281, 295, 967 A.2d 868 (App.Div.), certif. denied, 200 N.J. 207, 976 A.2d 384 (2009) (quoting Koruba v. Am. Honda Motor Co., 396 N.J.Super. 517, 525-26, 935 A.2d 787 (App.Div.2007), certif. denied, 194 N.J. 272, 944 A.2d 32 (2008)).
*700 "In terms of qualifications, an expert `must be suitably qualified and possessed of sufficient specialized knowledge to be able to express [an expert opinion] and to explain the basis of that opinion.'" Agha v. Feiner, 198 N.J. 50, 62, 965 A.2d 141 (2009) (alteration in original) (internal quotation marks omitted) (quoting State v. Moore, 122 N.J. 420, 458-59, 585 A.2d 864 (1991)); State v. Odom, 116 N.J. 65, 71, 560 A.2d 1198 (1989). N.J.R.E. 703 requires that "[t]he facts or data ... upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing." The rule further states that the facts or data need not be admissible in evidence if they are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences." Ibid.
Here, there was a sufficient objective foundation for Hals' conclusion that the zoning board would likely grant a variance for the improved lot coverage. Hals reviewed Saddle River's zoning ordinance, the history of the ordinance, the 1990 master plan, the 2003 master plan reexamination report, the planning report prepared by Preiss, and Hals' 2004 site plan. He concluded:
It can be expected that variance relief can be granted for the improved lot coverage as a [N.J.S.A. 40:55D-70]c(2) variance. 1) the application would relate to the specific property at 66 East Allendale Road[;] 2) the purposes of the [MLUL] would be advanced by the deviation of the zoning ordinance requirement[;] specifically it would encourage the appropriate use or development of land; promote adequate light air and open space; the development of the site would not conflict with the development of the State; [and] would promote a desirable visual environment through good civic design; 3) the variance can be granted without substantial detriment to the public good; the proposed improved lot coverage is consistent with the Saddle River commercial district; 4) the benefits out[weigh] any detriment; the improved lot coverage will provide the area needed ... for the building and adequate parking while preserving 58% of the lot for landscaping, greenery and wooded areas; 5) the variance will not substantially impair the intent and purposes of the zone plan and zoning ordinance; the past ordinances were 30% building coverage and 75% improved lot coverage. The proposal of 42% would be in substantial compliance with the original ordinance, would meet the requirements of the current PUD zone and would be consistent with the downtown area.
Similarly, Steck also concluded that a variance from the improved lot coverage restriction was reasonably probable. Steck reviewed Saddle River's 1990 master plan, its 2003 reexamination report, Hals' 2010 report, and Preiss' report. He stated that the 30% restriction did "not characterize the existing development in [the O-1] zone and violates the [MLUL] requirement that zoning must be drawn `with reasonable consideration to the character of each district and its peculiar suitability for particular uses.'" N.J.S.A. 40:55D-62. He also stated that in 2002 the New Jersey Department of Environmental Protection had characterized the property as having an impervious coverage limit from 61% to 80%, and that in such a situation, "a [N.J.S.A. 40:55D-70]c(2) argument [could be advanced] wherein stormwater detention facilities would lessen the rate of stormwater runoff."
Further, because we conclude that there was sufficient foundation for Hals' report, we reject Saddle River's argument *701 that Brody's valuation derivatively was net opinion because it was based on Hals' report. It is well-settled that an expert may rely on the opinion of other experts, so long as he or she forms an independent opinion. See Macaluso v. Pleskin, 329 N.J.Super. 346, 356, 747 A.2d 830 (App. Div.) (holding that "a treating doctor may testify as to the opinions of a nontestifying doctor if the treating doctor relied on those opinions in reaching his or her diagnosis or in formulating a plan of treatment and management of the patient"), certif. denied, 165 N.J. 138, 754 A.2d 1214 (2000); see also Costantino v. Ventriglia, 324 N.J.Super. 437, 451, 735 A.2d 1180 (App. Div. 1999) (holding that plaintiff's employability expert "was entitled to rely, as he did, upon the opinion of plaintiff's medical expert[ ]"), certif. denied, 163 N.J. 10, 746 A.2d 456 (2000); Statham v. Bush, 253 N.J.Super. 607, 612, 614, 602 A.2d 779 (App.Div.1992) (holding that plaintiff's employability expert could testify "based upon an interview with plaintiff, review of plaintiff's medical records[,] and an employability assessment he prepared based on published labor statistics").
The record demonstrates that there was a sufficient foundation for the opinions of defendant's experts. We affirm Judge Polifroni's exercise of discretion to allow the jury to consider the experts' reports and testimony.

V.
On cross-appeal, defendant argues that the judge should have granted compound interest on the judgment. Defendant contends that there is a "clear constitutional obligation of providing annual compound interest on the deficiency portion of condemnation awards," and relies on Borough of Wildwood Crest v. Smith, 235 N.J.Super. 453, 457, 563 A.2d 73 (Law Div.), aff'd o.b., 235 N.J.Super. 404, 407, 563 A.2d 48 (App.Div.), certif. denied, 113 N.J. 657, 552 A.2d 178 (1988).
Here, Judge Polifroni relied on Rule 4:42-11 (interest rate on judgments in tort actions) to compute the interest rate on the condemnation judgment. Defendant contends that the policy of awarding interest on tort judgments in personal injury cases "vastly differs from the purpose of providing interest on just compensation awards," that a tort victim has "no absolute entitlement to an award without first establishing liability," whereas a property owner "already has an established right to funds, representing just compensation, as of the date of taking." Defendant admits, however, that using Rule 4:42-11 rates is not an abuse of discretion, but contends that the judge "had no discretion to grant only simple rather than compound interest."
"[T]he allowance of interest on a condemnation award is a requirement of constitutional magnitude where the actual taking of the property is not contemporaneous with payment." Borough of Rockaway v. Donofrio, 186 N.J.Super. 344, 353, 452 A.2d 694 (App.Div. 1982) (citing Twp. of Wayne v. Cassatly, 137 N.J.Super. 464, 474, 349 A.2d 545 (App.Div.1975), certif. denied, 70 N.J. 137, 358 A.2d 184 (1976)). Further, trial judges have broad discretion in setting the interest rate on a judgment in such cases:
This right has been implemented by statute, N.J.S.A. 20:3-32, which requires the judge in a summary proceeding to fix the amount of interest. The judge should consider the prevailing commercial interest rates, the prime rate or rates, and the applicable legal rates of interest. "[T]he judge should then select that rate or rates of interest which will best indemnify the condemnee for the loss of use of the compensation to which he has been entitled from the date *702 on which the action for condemnation was instituted, less interest on all amounts previously deposited....
"[Casino Reinvestment Dev. Auth. v. Hauck, 317 N.J.Super. 584, 594, 722 A.2d 949 (App.Div.1999) (alterations in original) (citation omitted) (quoting Cassatly, supra, 137 N.J.Super. at 474, 349 A.2d 545), aff'd, 162 N.J. 576, 745 A.2d 1163 (2000).]"
During the December 17, 2010 oral argument on Saddle River's motion for a new trial, Judge Polifroni rejected defendant's proposed compounded interest and issued an oral opinion, stating:
The jury maximized the amount of compensation, gave the defendant every dollar it sought through its experts, and in fact awarded $250,000 more than the defense counsel asked for in his summation. Interest rates are lower now than they were at the time of the taking. And defendant's efforts to get a $3,000,000 offer for its property before the jury was rejected by the [c]ourt. That was an offer, nevertheless, defendant clearly intended to accept in exchange for the sale for the property. The real estate market is worse now than it was at the time that offer was made and at the time of the taking.
Based upon all of these circumstances in this particular case, and consistent with this [c]ourt's prior ruling, the simple interest calculation of [Rule] 4:42-11 is appropriate.
On appeal, defendant relies on the following passage from this Court:
If the full value of just compensation had been paid to the property owner contemporaneously with the taking, the landowner would have had the opportunity to earn compound interest on those funds. Prohibiting the landowner from recovering compound interest on a deficiency acts to effectively reduce the awarded past value by understating its present worth.
The thrust of the present proceeding is to make the plaintiff whole for the detention of monies justly due and owing. To apply an annual interest rate for the use of withheld funds and not insist on either timely payment of interest (concededly impossible) or annual compounding would be fatal to the very hypothesis that the detention is to be treated as a prudent business transaction. Indeed as the unpaid interest accumulates, the accumulated interest is the equivalent of an interest-free loan. This beneficence is not generally the hallmark of any prudent commercial transaction.
[Wildwood Crest, supra, 235 N.J.Super. at 457, 563 A.2d 73 (citations omitted).]
We note that on occasion we have affirmed awards of interest at simple rates. See, e.g., Hauck, supra, 317 N.J.Super. at 594, 722 A.2d 949.
At present, the Legislature has not provided a uniform rate of interest in condemnation actions, an omission that we specifically addressed in Twp. of W. Windsor v. Nierenberg, 345 N.J.Super. 472, 479-80, 785 A.2d 929 (App.Div.2001), certif. denied, 171 N.J. 443, 794 A.2d 182 (2002). There, we noted that "[d]eciding the issue on a case-by-case basis without regard to some unifying framework of analysis poses substantial dangers to the rights of property owners, public entities and the judicial process itself. It is axiomatic that similarly situated property owners should be treated in a similar manner." Ibid. We stated that "[a] rule of procedure could be promulgated, thus alleviating the problems we perceive. A study of the problem by the Civil Practice Committee or by a task force of experienced practitioners may perhaps be the wisest course." For the same *703 reasons, we decline to accept defendant's constitutional and policy argument. We conclude that the judge did not abuse his discretion in applying a simple rate of interest.
We affirm on the appeal and cross-appeal.
NOTES
[1] Saddle River is an affluent community in Bergen County, with a population of 3,500 people. Approximately 98% of the Borough is zoned for residential use. According to the Borough's 2003 Master Plan Reexamination Report, which was admitted into evidence at trial, the Borough is a "residential community with business development limited to that necessary to serve the daily needs and convenience of local residents."
[2] If the property were subdivided along the zoning line, the O-1 portion would conform to all zoning requirements, but the R-1 portion would not meet the minimum lot size requirement.
[3] Saddle River did not dispute that the zoning board would have likely granted a use variance to allow parking in the R-1 area.
[4] Saddle River also introduced Spence's plan into evidence.
[5] N.J.S.A. 40:55D-70c(2) provides that the board of adjustment shall have the power to grant a variance to allow departure from regulations "where in an application or appeal relating to a specific piece of property the purposes of [the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -163] ... would be advanced by a deviation from the zoning ordinance requirements and the benefits of the deviation would substantially outweigh any detriment."
[6] See State v. Simon Family Enters., L.L.C., 367 N.J.Super. 242, 253-54, 842 A.2d 315 (App.Div.2004) (holding that Caoili does not require a judge to determine that a proposed development plan, otherwise permitted by the zoning ordinance, would be a plan reasonably probable to occur); Jersey City Redevelopment Agency v. Mack Props. Co. No. 3, 280 N.J.Super. 553, 567, 656 A.2d 35 (App.Div. 1995) ("underscoring the necessity of the trial court to weigh the respective proofs, expert or otherwise, in applying the two-step Gorga/Caoili analysis, and to make specific findings predicated upon what a reasonable buyer and seller would consider in fixing the value of the condemned land"); State, by Com'r of Transp. v. Hope Road Assocs., 266 N.J.Super. 633, 644, 630 A.2d 387 (App.Div. 1993) (applying Gorga's two-step approach to "the prospect of a site plan approval, at least where ... the site is zoned for the proposed use and the condemnee has taken steps to obtain such approval as of the date of taking"), modified on other grounds, 136 N.J. 27, 641 A.2d 1038 (1994); State, by Comm'r of Transp. v. Caoili, 262 N.J.Super. 591, 596-97, 621 A.2d 546 (App.Div. 1993) (interpreting Gorga to mean that "even though the parties to a voluntary transaction may not believe that a zoning change is more likely than not, their belief that there may be a change should be taken into account if that belief is reasonable and it affects their assessment of the property's value"), aff'd, 135 N.J. 252, 639 A.2d 275 (1994); State, by Comm'r of Transp. v. Inhabitants of Town of Phillipsburg, 240 N.J.Super. 529, 542, 573 A.2d 953 (App.Div. 1990) (reversing where trial court instructed jury to value a vacant tract as if it were divided into building lots at the time of taking, when the lots had merely been laid out and sketched on plans with no further efforts to subdivide); State, by Comm'r of Transp. v. Market Assocs., 134 N.J.Super. 282, 284-85, 340 A.2d 663 (App.Div. 1975) (stating that "[g]iven the history through 1963 of the municipal zoning regulations affecting the use of all or the major portion of the lands condemned and the judicial treatment of those regulations ..., the likelihood that the amended regulations affecting the use of these premises, adopted in 1968, would be declared invalid in the litigation challenging their validity (pending at the time of the filing of the condemnation proceeding), was exceedingly strong" and should not have been excluded under Gorga).
[7] The judge acknowledged that a plenary hearing would be needed to make his threshold findings, rather than relying on only expert reports or deposition testimony. See Kemp ex rel. Wright v. State, 174 N.J. 412, 431-33, 809 A.2d 77 (2002) (recognizing that, in performing a gatekeeping role, the lack of an N.J.R.E. 104(a) hearing "may adversely have affected plaintiff's ability to present their expert testimony in its best light").