**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2030-15T4

MICHAEL D. KIEFFER, Individually
and Derivatively on behalf of
DIGITAL PRODUCTION, INC.,

    Plaintiff-Respondent,

v.

CHARLES A. BUDD and
DIGITAL PRODUCTION, INC.,

    Defendants-Appellants.

_____

> Submitted March 8, 2017 — Decided August 24, 2017
>
> Before Judges Fuentes, Simonelli and Gooden Brown.
>
> On appeal from the Superior Court of New Jersey, Chancery Division, Gloucester County, Docket No. C-0006-12.
>
> Hagner & Zohlman, LLC, attorneys for appellants (Thomas J. Hagner, of counsel and on the briefs).
>
> Fox Rothschild LLP, attorneys for respondent (R. James Kravitz, of counsel and on the brief).

PER CURIAM

In this minority shareholder oppression and breach of contract matter, defendants Charles A. Budd and Digital Production, Inc. (DPI),[1] appeal from the September 16, 2015 Chancery Division order for judgment entered in favor of plaintiff Michael D. Kieffer. Defendants also appeal from the December 31, 2015 order denying their motion for a new trial, and from the December 31, 2015 final judgment. We affirm.

We derive the following facts from the evidence presented at the two-day bench trial before Judge Anne McDonnell. DPI is a closely held family business engaged in providing graphic solutions to retailers and manufacturers. Budd is DPI's founder and president and was its sole shareholder until October 22, 2010.

On June 4, 2010, DPI and plaintiff executed an employment agreement whereby DPI would employ plaintiff as vice-president once he became a shareholder and owned at least twelve shares of DPI's common stock, and pay him an annual salary of $100,000, "payable in accordance with [DPI's] normal payroll practices for its employees." Once plaintiff purchased the shares, DPI would pay him "an annual salary in the amount corresponding with the level of [DPI's] gross sales achieved by [DPI] during its fiscal

---

[1] We shall sometimes refer to Budd and DPI collectively as defendants.

year (as reported on [DPI's] compiled financial statements based on the accrual method of accounting)[.]" Specifically, DPI would pay plaintiff an annual salary of $110,000 if its gross sales were between $1.5 million and $2,999,999 during its fiscal year. DPI could change plaintiff's salary upon prior notice. The employment agreement also required DPI to pay plaintiff a $7500 signing bonus, payable in three installments of $2500 on the first day of July, August, and September 2010.

After signing the employment agreement, plaintiff received the following payments from DPI:

| | |
|---|---|
| June 15, 2010: | $3076 |
| June 24, 2010: | $3100 |
| July 10, 2010: | $2500 |
| August 13, 2010 | $1506 |
| August 18, 2010 | $2,866.84 |
| September 19, 2010: | $727.38 |
| October 22, 2010 | $5000 |

DPI's general ledger contained separate entries for net payroll. The general ledger did not list any of the above payments as payroll or salary payments, and there are no payroll records for the period June 4, 2010 to October 22, 2010. In addition, the payments do not reflect any pay period, and are not consistent with a $100,000 annual salary. Notably, DPI's 2010 federal tax return for the fiscal year beginning April 2, 2010 and ending March 31, 2011, did not list plaintiff as an officer or shareholder of DPI. Plaintiff testified that the above payments were for

independent contracting work he performed for DPI prior to purchasing the shares and commencing employment as DPI's vice-president on October 22, 2010.

Also on June 4, 2010, DPI, Budd, and plaintiff executed a stock purchase agreement, whereby Budd agreed to sell twelve of his 100 shares of DPI's common stock to plaintiff for $13,016 per share for a total of $156,192. On October 22, 2010, plaintiff purchased the twelve shares for that amount, deriving the money from a mortgage on his home. That same day, DPI, Budd, and plaintiff executed a stock restriction agreement, and DPI's Board of Directors (Board) issued a resolution electing plaintiff to the Board and appointing him DPI's vice-president effective that day.

Termination of plaintiff's employment with DPI was one of the events that triggered the application of the stock restriction agreement. If plaintiff's employment was terminated other than for cause during the first twelve months of his employment, DPI had to purchase, and plaintiff had to sell, all of his shares of stock at $13,016 per share for a total of $156,192, payable in one lump sum no later than sixty days after termination. If termination occurred after the first twelve months, the purchase price would be the stock's fair market value.

DPI's payroll records reveal that on November 12, 2010, plaintiff received his first paycheck in the gross amount of

$3,846.16 (amounting to $100,000 annually) for the bi-weekly pay period beginning October 23, 2010, and ending November 5, 2010. Plaintiff continued receiving $3,846.16 bi-weekly until April 11, 2011, when the Board issued a resolution, which plaintiff signed, reducing his and Budd's salaries to $1000 bi-weekly, and authorizing the treasurer to make loans to them so they could pay their personal expenses until business improved.

Plaintiff testified that Budd said the salary reduction was temporary and necessary to induce the bank to purchase DPI's receivables. Budd testified that DPI had a $250,000 loss as of March 31, 2011, sales were not good, and plaintiff's salary reduction, as well as the layoff of two employees (his son Brian and girlfriend Julie Pfeiffer) was necessary to reduce payroll because DPI lacked a sufficient cash flow. Budd also testified it would not have been responsible to allow DPI to continue to pay plaintiff's original salary.

In addition to his $1000 bi-weekly salary, plaintiff received five checks in the amount of $1500 each, for a total of $7500. Four of the checks bore the notation "Loan," while one bore the notation "Employee Advance." According to plaintiff, there was no loan agreement and he considered these payments to be salary, not loans. Budd testified the payments were loans.

Plaintiff testified that Budd eventually told him the bank was not purchasing DPI's receivables and DPI lacked funds to reinstate plaintiff's salary. Plaintiff thereafter discovered that Budd had been defalcating corporate funds during the time he claimed DPI lacked funds to pay plaintiff's salary. Specifically, Budd used DPI's funds to finance a business known as Born to Wrap Graphics, LLC (BTWG), which Brian managed, and pay for trips to Cancun, Las Vegas, and Boca Raton and Pfeiffer's gym membership fees and automobile insurance. Budd also used DPI's funds to pay for his grandchild's childcare costs, carpeting in his home, coffee at Starbucks, Broadway theatre tickets, and purchases at Barnes and Noble. Defendants produced no documents evidencing a business purpose for any of these expenditures. Plaintiff also learned that Brian's girlfriend, who was the mother of Budd's grandchild, was on DPI's payroll.

On August 11, 2011, plaintiff resigned after an argument with Budd about his salary. Brian replaced plaintiff at a salary of $2000 bi-weekly beginning September 16, 2011, which increased to $2500 bi-weekly beginning November 25, 2011.

Plaintiff, as a minority shareholder, demanded copies of certain DPI financial records. In response, Budd demanded redemption of plaintiff's shares of stock for $50,000, payable over five years. Plaintiff rejected the offer and filed a

A-2030-15T4

complaint, alleging minority shareholder oppression and breach of contract, among other things. Defendants counterclaimed, alleging breach of contract, specific performance of the stock restriction agreement, breach of the employment agreement, and fraud, among other things.

An issue at trial was the commencement date of plaintiff's employment, which effected the purchase price for his shares of stock. Plaintiff asserted his employment with DPI commenced on October 22, 2010, when he purchased the shares and was appointed DPI's vice-president. Plaintiff averred that because his employment terminated on August 11, 2011, less than twelve months after it commenced, he was entitled to $13,016 per share for a total of $156,192. Defendants asserted that plaintiff's employment commenced on June 4, 2010, the day he signed the employment agreement, and ended more than twelve months later, thus entitling him to only the fair market value of his shares. As evidence of the commencement date, defendants pointed to the payments plaintiff received from DPI after plaintiff signed the employment agreement.

Also at issue was the amount of plaintiff's salary. Plaintiff asserted that because DPI's gross sales exceeded $1.5 million during the fiscal year ending March 31, 2011, his salary should have been $110,000. A court-appointed expert rendered a report

7

and testified that DPI had gross sales of approximately $1.7 million for the fiscal year ending March 31, 2011. The expert concluded that plaintiff was entitled to an annual salary of $110,000, and DPI's financial statements should have listed a liability in the amount of $10,000 for deferred salary, as plaintiff was not paid in accordance with the employment agreement. Defendants did not challenge the expert's report or testimony, or produce evidence that DPI's revenues were less than $1.5 million for the fiscal year ending March 31, 2011.

In a comprehensive written opinion, dated September 16, 2015, Judge McDonnell found credible plaintiff's testimony that Budd said plaintiff's salary reduction was necessary to induce the bank to purchase DPI's receivable. The judge emphasized that "if [Budd] had told [plaintiff] the truth, i.e. that it was not in the interest of DPI to pay [plaintiff's] salary, [plaintiff] would not have stayed an additional four months."

Judge McDonnell determined that during the time of plaintiff's salary reduction, Budd used large amounts of DPI's funds to finance BTWG, pay his grandchild's daycare expenses, Pfeiffer's gym membership, and Budd's trips, and Brian's girlfriend, who was on DPI's payroll in a clerical position. The judge found that Budd did not tell plaintiff DPI was paying these expenses.

Judge McDonnell found that plaintiff was an oppressed shareholder. She determined that "DPI, at Budd's direction and without [p]laintiff's knowledge, spent substantial sums to support Brian and his family. This depleted DPI's funds that would otherwise have been available to fund activities to increase DPI['s] sales and productivity in the print and newly-established digital POP display market." The judge concluded as follows:

> Here, the lack of transparency in payments made by DPI to and on behalf of Brian and his family and BTWG, the total amount of money diverted from DPI, and the simultaneous [two-third] reduction of [p]laintiff's salary are persuasive in determining that [Budd's] conduct was oppressive.
>
> . . . .
>
> Plaintiff has proved [he] was affected by the diversion of money from DPI to [Budd's] family. He lost his substantial salary at the same time money was flowing out of DPI for day care and BTWG expenses. Plaintiff had no voice in the amount or to whom DPI's funds were being paid. . . . Plaintiff has proved that DPI payments to [Budd's] family members affected DPI's ability to pay his salary.

Judge McDonnell found that defendants breached the stock restriction agreement. She acknowledged the parties had signed the employment agreement on June 4, 2010, but found there were no documents for the year 2010 confirming when plaintiff began receiving his $100,000 salary. The judge determined that plaintiff's employment officially commenced on October 22, 2010,

when he purchased the shares, and his pre-employment services to DPI were as an independent contractor. The judge also determined that the reduction of plaintiff's salary in April 2011 constituted a constructive termination. Thus, the judge concluded that plaintiff was entitled to $156,192 for his shares. The judge gave plaintiff the option of selling his shares for $47,000, which the court-appointed expert had determined was the stock's fair market value as of March 31, 2012, or compelling DPI to purchase them for $156,192. Plaintiff chose the latter remedy.

Judge McDonnell found that defendants had breached the employment agreement by failing to pay plaintiff $110,000 in salary. The judge determined that plaintiff was entitled to a salary of $110,000, effective April 1, 2011, and awarded him $29,461.44 for unpaid salary from April 1, 2011 through August 5, 2011. The judge reduced this amount by the amount of loans made to plaintiff, and awarded him a net of $22,141.44 for unpaid salary. The judge dismissed defendants' counterclaim with prejudice.

Judge McDonnell memorialized her decision in a September 16, 2015 order for judgment. Defendants subsequently filed a motion for a new trial, and plaintiff filed a cross-motion to enter judgment. In a December 31, 2015 order, the judge denied defendants' motion for a new trial for the reasons expressed in

10

her September 16, 2015 written opinion.  In a December 31, 2015 final judgment, the judge entered judgment in plaintiff's favor in the amount of $178,333.44 plus pre-judgment interest.[2]

On appeal, defendants contend the record does not support Judge McDonnell's finding that plaintiff's employment commenced on October 22, 2010, and he was constructively terminated in April 2011.  Defendants also contend that even if plaintiff was constructively terminated, it was no sooner than mid-August 2011. Defendants further contend the judge erred in finding DPI breached the employment agreement by not paying plaintiff $110,000 in salary; finding that plaintiff was an oppressed shareholder within the meaning of N.J.S.A. 14A:12-7; dismissing the counterclaim for fraud; not granting defendants' motion for a new trial; and not awarding defendants fees and costs pursuant to N.J.S.A. 14A:12-7(10).

Our review of a trial court's fact-finding in a non-jury case is limited.  Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011).  "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence.  Deference is especially appropriate when the

_____

[2]  In a March 18, 2016 order, the judge corrected the final judgment to omit the award of pre-judgment interest and grant plaintiff post-judgment interest pursuant to Rule 4:42-11 as of October 15, 2015.

evidence is largely testimonial and involves questions of credibility." Ibid. (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). We "should not disturb the factual findings and legal conclusions of the trial judge unless [we are] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Ibid. (quoting Cesare, supra, 154 N.J. at 411-12). However, we owe no deference to a trial court's interpretation of the law, and review issues of law de novo. State v. Parker, 212 N.J. 269, 278 (2012); Mountain Hill, L.L.C. v. Twp. Comm. of Middletown, 403 N.J. Super. 146, 193 (App. Div. 2008), certif. denied, 199 N.J. 129 (2009).

"[G]ranting or denying a motion for a new trial rests with the sound discretion of the trial court and should only be granted if, having given due regard to the opportunity of the [factfinder] to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." Borough of Saddle River v. 66 E. Allendale, LLC, 424 N.J. Super. 516, 526 (App. Div.) (citations omitted), certif. granted, 211 N.J. 274 (2012). We will not reverse a trial court's decision to deny a motion for a new trial "unless it clearly appears that there was a miscarriage of justice under the law." R. 2:10-1.

We have considered defendants' contentions in light of the record and applicable legal principles and conclude they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). We affirm substantially for the reasons Judge McDonnell expressed in her written opinion. However, we make the following brief comments.

The record amply supports Judge McDonnell's finding that plaintiff's employment with DPI commenced on October 22, 2010. There is no evidence that the payments DPI made to plaintiff prior to October 22, 2010 were for the salary he was to be paid pursuant to the employment agreement. Rather, DPI's payroll records confirm that plaintiff began receiving his salary in accordance with the employment agreement as of October 23, 2010. Thus, even if plaintiff's seventy-percent salary reduction in April 2011 did not constitute a constructive termination, the termination of his employment in August 2011 occurred less than twelve-months after his employment commenced, entitling him to $156,192 for his shares pursuant to the stock restriction agreement. Defendants' failure to pay plaintiff that amount constituted a breach of the stock restriction agreement.

The record also amply supports Judge McDonnell's finding that plaintiff was entitled to a salary of $110,000 as of April 1, 2011, pursuant to the employment agreement. The unchallenged

13

expert evidence confirmed that DPI had gross sales over $1.5 million in the fiscal year ending March 31, 2011, and plaintiff was entitled to be paid $110,000. Defendants produced no evidence to establish that DPI had accrual-based revenue of less than $1.5 million, and do not contend that revenues were less than that amount. Defendants' failure to pay plaintiff a salary of $110,000 as of April 1, 2011 constituted a breach of the employment agreement.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2030-15T4